**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

MELODY COE,

        Plaintiff,

vs.

NORTHERN PIPE PRODUCTS, INC.,

        Defendant.

No. C 07-3068-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *1.   The parties and principal actors* . . . . . . . . . . . . . . . . . . . 6
    *2.   Coe's performance problems and termination* . . . . . . . . . . . 7
    *3.   Coe's allegations of sexual harassment* . . . . . . . . . . . . . . 10
    *4.   The aftermath of Coe's allegations* . . . . . . . . . . . . . . . . . 13
  *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    *1.   Coe's claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    *2.   NPP's motion for summary judgment* . . . . . . . . . . . . . . . . 15

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . 16
    *1.   General principles* . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    *2.   Disregard of evidence from "interested" or "impeached" witnesses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    *3.   Special concerns in employment discrimination cases* . . . . . . 27
  *B. The Nature Of Coe's "Sex Discrimination" Claim* . . . . . . . . . . . . . 29
    *1.   ***Quid pro quo** versus hostile environment harassment* . . . . . 29
    *2.   Coe's claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
  *C. Arguments Concerning Coe's **Quid Pro Quo** Claim* . . . . . . . . . . . . 33

      *1. NPP's initial argument* . . . . . . . . . . . . . . . . . . . . . . . . 33
      *2. Coe's response* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
      *3. NPP's reply* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
      *4. The parties' oral arguments* . . . . . . . . . . . . . . . . . . . . 37
  *D. Actionable Sexual Advances* . . . . . . . . . . . . . . . . . . . . . . . 38
      *1. Demands for sexual favors* . . . . . . . . . . . . . . . . . . . . . 39
      *2. Touching* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      *3. Coe's evidence of sexual advances* . . . . . . . . . . . . . . . . 40
  *E. The Connection Between The Advances And The Job Detriments* . . . . 43
  *F. Independent Decisionmakers And "Cat's Paws"* . . . . . . . . . . . . . 44
      *1. Formulations of the "cat's paw" rule* . . . . . . . . . . . . . . 45
      *2. Applications of the rule in this circuit* . . . . . . . . . . . . . 47
      *3. The necessary extent of the biased subordinate's "participation"* . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
      *4. Application of the appropriate standard* . . . . . . . . . . . . 57
  *G. Availability Of A "Mixed Motives" Analysis* . . . . . . . . . . . . . . 59
      *1. "Mixed motives" and "direct evidence"* . . . . . . . . . . . . . 59
      *2. "Mixed motives" and "independent decisionmakers"* . . . . . . 60
      *3. Alternative claim or defense* . . . . . . . . . . . . . . . . . . . 61
      *4. Coe's "mixed motives" claim* . . . . . . . . . . . . . . . . . . . 66
  *H. Vicarious Liability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      *1. Vicarious liability and the* **Ellerth/Faragher** *affirmative defense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
      *2. Harassment by a "supervisor"* . . . . . . . . . . . . . . . . . . 68
      *3. NPP's other contentions* . . . . . . . . . . . . . . . . . . . . . . 70
  *I. Coe's Retaliation Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . 71
      *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 71
      *2. Elements of a* **prima facie** *case* . . . . . . . . . . . . . . . . . 72
      *3. Coe's* **prima facie** *case* . . . . . . . . . . . . . . . . . . . . . . 73
  *J. Punitive Damages* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
      *1. Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . . 80
      *2. Applicable standards* . . . . . . . . . . . . . . . . . . . . . . . . 81
      *3. NPP's "good faith"* . . . . . . . . . . . . . . . . . . . . . . . . . 82

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Among other interesting questions, this sex discrimination and retaliation case raises the unsettled question—in this and other circuits—of the extent of the influence that an allegedly biased subordinate must exercise over a purportedly independent decisionmaker who took adverse employment action against a plaintiff employee before a defendant employer can be held liable for discrimination under a "cat's paw" theory. Although the Eighth Circuit Court of Appeals has articulated a test for "cat's paw" liability, its applications of that test so far have not answered the precise question posed here. Therefore, this court must now address that question with only general Title VII agency principles and persuasive authorities for guidance.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the defendant's motion for summary judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for purposes of summary judgment. Additional factual allegations and the extent to which they are or are not disputed or material will be discussed, if necessary, in the court's legal analysis.[1]

---

[1] The plaintiff has provided her response to the defendant's statement of undisputed facts in a "spreadsheet" format, showing each of the defendant's factual allegations and the plaintiff's response to it "side by side." This presentation has much to recommend it, because it makes it unnecessary to consult two separate filings to determine what facts are

(continued...)

in dispute and which are not, and it allows the court to compare the portions of the record cited by the parties as pertinent to any disputed factual allegations.

Nevertheless, the court's ability to determine what facts are truly in dispute has been considerably hampered by the plaintiff's failure to comply with either the letter or the spirit of N.D. IA. L.R. 56.b.2., which requires "[a] response to the [movant's] statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's numbered statements of fact. . . ." Instead of expressly admitting or denying many of the defendant's factual contentions, the plaintiff has offered "qualified" answers that assert additional facts with no clear indication of how those additional facts qualify, or even relate to, the facts stated by the moving party, without ever disputing the truth of the defendant's factual contention. One such example—among many—is the plaintiff's response to the defendant's assertion that "Mr. Doggett is the most senior human resources officer at NPP," which states the following:

> Qualified. Mr. Doggett has only been the Human Resources Director since 1988. Prior to that, he worked as a Quality Control Specialist in the production department. Eventually he was promoted to Quality Control Manager before being named Human Resources Manager.

Plaintiff's Response To Defendant's Amended Statement Of Material Facts (Plaintiff's Response) (docket no. 22-2), ¶ 6 (citations to appendices omitted). In this response, the plaintiff never expressly admitted or denied the defendant's assertion that Doggett was the most senior human resources officer at NPP, nor properly qualified her response by admitting that Doggett was the most senior human resources officer at NPP at times relevant to this lawsuit or after a certain date. Instead, the plaintiff made extraneous "qualifications" that detail other positions that Doggett had occupied at times not relevant to the present dispute. Another such example is the plaintiff's response to the defendant's statement that "Mr. Burger was hired in 1991," which states the following:

> Qualified. Mr. Burger was hired by NPP as a production worker in 1991. After six months, he became a forklift operator in the yard. He served that function for approximately 5 years before being named Yard Supervisor. Steve Burger supervised two people in the yard, Chad and Tom. Steve Burger became Traffic Manager sometime in

¹(...continued)
2003.

Plaintiff's Response, ¶ 10 (citations to appendices omitted).  From this response, it is apparent that the plaintiff could and should have expressly admitted that Burger was hired in 1991.  The defendant's factual statement is not an assertion that Burger had held any particular position since 1991, nor is it an assertion about the position that he held at the time of the conduct at issue in the case, which might have invited a "qualification" about his position at that time.  Thus, the additional facts included in the plaintiff's "qualification" are not responsive to the truth of the defendant's factual assertion about when Burger was hired, even if they are relevant to the present dispute in some way that is not at all apparent simply from the defendant's assertion or the plaintiff's response.

The plaintiff has also frequently failed to comply with the specific requirements of N.D. IA. L.R. 56.b.2. concerning citation to parts of the record demonstrating the basis for a factual dispute, which provides as follows:

> A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record.  The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.

Instead of citing portions of the record supporting her contention that certain statements of fact are disputed, the plaintiff frequently offers as her entire response an assertion that "[t]he only testimony upon which this assertion is made is that of an interested and/or impeached witness and therefore the facts cannot be assumed to be true for the purposes of this motion." *See, e.g.,* Plaintiff's Response, ¶ 50.  In support of these contentions, the plaintiff cites *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).  The court will return, below, to the plaintiff's novel contention that all she has to do to generate a genuine issue of material fact is to assert that the person to whom the movant attributes certain factual contentions is "interested."

5

### 1. *The parties and principal actors*

Defendant Northern Pipe Products, Inc., (NPP) is a manufacturer of polyvinyl chloride (PVC) pipe with headquarters in Fargo, North Dakota, and a manufacturing plant in Hampton, Iowa. From April 2005 until her termination in December 2006, plaintiff Melody Coe was employed by NPP as a truck driver to transport pipe manufactured by NPP from its Hampton plant to various purchasers. NPP truck drivers transport raw materials, works in progress, and finished goods; load and unload trucks, with or without helpers; make some mechanical truck repairs; and complete vehicle checks and pre- and post-trip inspections on every trip. On February 15, 2006, Coe and other truck drivers received a notice stating the following: "ALL LOADS MUST BE STRAPPED!! If Loads Are Not Strapped They Do Not Leave The Yard! *Failure to Strap Loads Properly Means Immediate Termination for the Driver!" Coe contends, however, that trucks were sometimes "pre-loaded"—which apparently involved "strapping" and "tarping," as well—by the "yard guys."

The other *dramatis personae* of primary interest here are Ken Doggett, NPP's Human Resources Manager at the times pertinent here, who was employed at NPP's Fargo office; Steve Burger, NPP's Traffic Manager at the times pertinent here, who was also employed at NPP's Fargo office; and Michelle Hartman, NPP's Administrative Assistant at NPP's Hampton plant at the times pertinent here. As Traffic Manager, Steve Burger's job was to oversee trucking operations and to assure that loads were shipped in a timely manner. Burger also interviewed applicants with Doggett, and Burger and Doggett consulted and usually agreed with each other about potential hirings and terminations. The parties dispute whether Burger had any authority to discipline or terminate employees on his own, however. Coe contends that part of Burger's job was to initiate disciplinary action, but NPP contends that Burger had no authority to discipline employees on his own,

6

but only jointly with Doggett, and that hiring and termination decisions were made in consultation between Burger and Doggett. Burger and Doggett made a joint decision to hire Coe. As the Administrative Assistant for the Hampton plant, Michelle Hartman did general truck driver paperwork, lined up truck drivers' daily loads, posted driver meeting notices, performed administrative work, scheduled company trucks, and worked with outside carriers.

### 2. Coe's performance problems and termination

NPP asserts that Coe had various performance problems during 2006, some of which Coe admits and others of which she disputes. Those performance problems included an accident in June 2006 in which Coe drove a truck off the road, resulting in the total loss of the tractor and damage to the trailer, for a loss to NPP totaling somewhere between $38,000 and $48,000.[2] Coe received a letter of counseling and final warning concerning this accident, signed by Burger, which included the statement, "Final Warning: Driver will be required to complete drivers training prior to returning to duty. Driver will be terminated immediately if the above occurs again." Notwithstanding the accident, Coe received a favorable performance review from Burger in July 2006.

Other alleged performance problems included complaints from other drivers that Coe did not help in the yard to load trucks, which Coe disputes; Coe's loss of a coil pipe off of her truck in November 2006, when she failed to "strap" the load, which Coe admits; Coe's failure to "smoke tarp" a load of pipe prior to leaving the facility, to protect the pipe from diesel fumes during transport, which Coe contends occurred because the pipe had been tarped on the ground before loading and was already loaded, strapped, and hooked

---

[2]NPP identified the loss in a letter of warning to Coe as "about $48,000," but also contends, without dispute, that the vehicle accident cost NPP, a self-insured company, $38,441.11.

to her trailer when she went to her truck; and Coe's delivery of pipe to the wrong site on November 21, 2006, which Coe contends actually involved delivery of one load a day early and delivery of the correct load to the same customer by 6:00 a.m. the next morning, which resolved the incident to the customer's satisfaction.

Ms. Hartman brought Coe's performance incidents to the attention of the Fargo office, including Doggett. NPP contends that, in December 2006, Doggett decided to give Coe a disciplinary warning and that he initiated the warning, because he did not believe that Burger would do so, essentially because he thought that Burger was reluctant to issue disciplinary notices. Apparently on Doggett's instructions, Burger gave Coe a disciplinary letter on December 5, 2006, when she made a "run" to Fargo. That disciplinary letter warned Coe about her failure to "smoke tarp" a load and about not reading her paperwork resulting in delivery of pipe to the wrong site. Coe disputes the accuracy of the description of the incidents for which she received the disciplinary letter, but does not dispute that she was warned for the reasons stated. Burger and Coe met for the meeting in which Burger gave Coe the disciplinary letter in an office or room alone at NPP's Fargo headquarters, and the other offices in the area also were not occupied at the time. Consequently, Coe contends that the location of the meeting was improper.

Shortly after the December 5, 2006, meeting, Coe called Burger to tell him that she was having problems with an air compressor on her trailer brakes. Coe called Burger directly to be sure that he knew about the problem. Coe later called Hartman to explain that her trailer was in the shop for repairs and that it would be some time before a part necessary for the repair would be delivered. Coe contends that Burger told her to take time off until her truck was repaired or that Hartman told her that Burger had told Hartman to tell Coe that she should take time off until her truck was repaired. Hartman denies that she told Coe to take time off. Coe also contends that she was not "on call" during the time

that her truck was being repaired nor was she otherwise required to check in with the Hampton office, and that the battery on her company cell phone had died, and the charger was still in her truck, so that she could not receive calls.

On December 6, 2006, Hartman posted a notice for a mandatory meeting for Hampton truck drivers at the Hampton plant on December 11, 2006, for which Doggett and Burger were driving in from Fargo. Coe contends that the purpose of the meeting was to lay off drivers and that she would have been laid off had she attended the meeting. She also contends that the layoffs could have been made by telephone, but NPP asserts that Burger and Doggett preferred to make such announcements in person. Hartman claims that she recalls reminding Coe of this meeting, but Coe denies that she knew about the meeting until after it occurred. In any event, there is no dispute that Coe did not attend the meeting. NPP contends, and Coe disputes, that, after the meeting, Doggett and Burger were informed by other drivers that Coe had continued to drive her truck with the brake problem and had ruined a new set of tires by doing so. Coe admits, however, that Burger was told at the December 11, 2006, meeting that Coe had dragged the tires and ruined them. NPP contends that, after the meeting, Doggett told Burger that he had no more patience with Coe and wanted to terminate her, but that Burger convinced Doggett to reserve judgment until they had heard from Coe about why she had not attended the meeting or responded to calls left for her by Hartman on her company cell phone and at the repair shop. At some point, Hartman also drove out to Coe's house, but did not find Coe, although Coe contends that Hartman admitted that she did not even go to the door. NPP contends that, by late afternoon on December 14, 2006, Coe had still not called in, so Doggett made the decision to terminate her. Coe contends that Doggett made the termination decision in collaboration with Burger. NPP acknowledges that Doggett tried

to make the termination decision a collaborative decision with Burger and that Burger ultimately agreed with that decision.

When Coe called Burger on December 15, 2006, Burger explained to her that her employment was being terminated because she had missed the meeting. Because Coe was not happy with the decision, either Coe asked Burger to have Doggett call her, or Burger asked Doggett to call Coe. In any event, the parties agree that Doggett was willing to hear Coe's explanation for missing the meeting, and did call her. NPP contends, however, that Doggett found Coe's explanation that she had not called in to work for several days because her company cell phone was not charged was not an adequate excuse for a professional truck driver to miss a mandatory meeting. The parties agree that Doggett did not change his decision to terminate Coe after he talked to her.

### 3.     Coe's allegations of sexual harassment

The parties agree that, after it was clear that Coe was being terminated, Coe told Doggett that she thought her termination was the result of events in October 2006 involving Burger. The parties have pointed to nothing in the record showing that Doggett knew of those events prior to Coe's telling him about them at the time of her termination. The events in question occurred when Burger was in Hampton to learn Hartman's duties, because Hartman's grandmother was very ill, and NPP anticipated that Hartman would need to take leave.

More specifically, during the week of October 9, 2006, Burger did an 80-mile round trip "test run" with Coe of a trailer that had been modified to haul coil pipe and to make it easier to roll off the pipe. During the "test run," the parties agree that Burger talked about Coe taking a different job at NPP, although they disagree about precisely what that job was. NPP contends that the job for which Burger said he would recommend Coe was a job assisting Hartman, but Coe contends that the job Burger talked about was a

promotion to a traffic control and sales position. NPP contends that Coe expressed interest in the job, but understood that the decision still had to be made by Burger's boss. Coe contends that she accepted the promotion and told her family about it, but otherwise honored Burger's request not to tell anyone at work about it until it was final.

During the "test run," Coe and Burger also talked about trucking equipment. Coe told Burger about a trucking magazine at her house that she wanted to give him, so they stopped at her house on the way back to the Hampton plant. When Coe and Burger stopped at Coe's house, Burger was on his cell phone with Shane Kluth in Fargo. Coe contends that Burger said something to Kluth about "you'll never guess where I'm at," said that he was at Coe's house, then laughed, and hung up.[3] While at Coe's house, Burger asked if he could use the bathroom, and Coe agreed. Coe and Burger entered the house through the kitchen, and Coe gave Burger directions to the bathroom, then went to her bedroom to get the magazine that they had talked about and a newspaper clipping. When Burger came out of the bathroom, he proceeded down the hall toward Coe's bedroom, flipped on the light switch in her bedroom, and asked, "This is your bedroom?" Coe contends that she ignored the question and continued to walk away from her bedroom. Coe and Burger then returned to the kitchen, where Burger asked about the location of a pool table that they had also discussed. Coe had told Burger that the movers had put the slate on the pool table the wrong way. Coe and Burger went to the basement to look at the pool table, and Burger offered to try to fix the pool table the following week, when he was to return to Hampton with another NPP employee, Jerry Griggs. Coe and Burger then left the house and returned to NPP's Hampton plant.

_____

[3]NPP notes that Burger and Kluth deny that such a conversation occurred, but NPP admits, for purposes of its summary judgment motion, that the conversation did occur essentially as described.

During the week of October 16, 2006, Burger and Griggs were in Hampton to learn more about Hartman's job and to attend to other duties. Burger and Griggs were staying at the AmericInn Hotel in Hampton. Burger and Griggs had dinner together through the week, checked out classic cars, and watched television. Coe contends that, during the week of October 16, 2006, Burger also engaged in sexual advances toward her.

Specifically, on October 18, 2006, in the late afternoon, Burger called Coe when she was in her truck and asked her what she was doing. Coe responded that she was coming back from running a load and was going home. NPP contends that there were other calls between Coe and Burger, most lasting only about a minute, during that week, but that such calls were common at other times, as well, and that they usually pertained to work. Around 5:30 or 6:00 p.m. on October 18, 2006, Burger went to Coe's house, knocked, and stood at the door, but even though Coe was at home and had seen Burger come to the door, she did not let him in or acknowledge that he was at the door. Griggs accompanied Burger to Coe's house, but Coe did not see him, and he testified that he stayed in their vehicle while Burger went to the door. Burger and Griggs ostensibly went to Coe's house to offer to fix her pool table. Later, after returning to his motel, Burger called Coe again, about 7:20 p.m., to ask if Coe wanted company, but Coe said no. Burger also told Coe that he had been out to her house, but Coe told him she did not know he was there and that she was probably in the shower. Burger apparently asked again if Coe wanted company, and Coe again said no, she was in bed. Coe contends that, at the end of the conversation, Burger told her, "Sweet dreams."

On October 19, 2006, Burger again called Coe about 4:58 p.m., to ask what she was doing, and Coe again said that she was driving and on her way home. Burger again asked if Coe wanted company, and Coe replied that she was busy and had errands to run. Coe alleges that, during this telephone call, Burger also asked if Coe wanted to come to

his motel room, but Coe contends that she ignored the question. Burger then said, "Did you hear what I said?" Coe contends that she did not want to answer this question, so she said, "What?" Coe contends that Burger then said, "I asked you to come to my motel room," to which Coe again responded that she was busy and had errands to run. Coe contends that Burger then said, "Well, when you're done running your errands, maybe you could stop by later," but Coe said, "I don't think so." About twenty-five minutes after the first call on October 19th ended, Coe admits that she called Burger back to apologize for being rude on the phone. Burger admits that a call took place on October 19, 2006, that he asked if Coe wanted help with her pool table, and that he asked if Coe wanted to stop by his motel, intended that they play pool with Griggs in the lounge area, because the motel had a full-size pool table.

Coe contends that, after the calls and incidents in the first few weeks of October 2006, Burger's "attitude changed tremendously," because they had formerly had no problems, but he became sarcastic and argumentative, and Coe felt that he was picking on her. Nevertheless, Burger and Coe still had numerous phone calls after October 19, 2006, but Coe contends that she initiated most of the calls. The only time that Burger and Coe saw each other after October 19, 2006, was for the counseling session on December 5, 2006, described above. Coe admits that she never reported any alleged harassment by Burger or anyone else to anyone at NPP prior to her termination. She also admits that she never told Burger that his conduct had made her uncomfortable.

### 4. *The aftermath of Coe's allegations*

In response to Coe's revelations of alleged sexual harassment, Doggett requested written statements from Burger and Griggs. Burger admitted to Doggett that he had asked Coe to come to his motel, and Doggett criticized Burger for doing so, because he believed that such a situation involving a male supervisor and a female employee could be

misconstrued. However, Burger's written statement did not mention that he had asked Coe to come to his motel, and Doggett did not require Burger to make any changes to his statement. Coe contends that Doggett's investigation did not comply with NPP's Sexual Harassment Policy, but NPP contends that Doggett did not believe that Coe had made a formal complaint of sexual harassment, because she did not bring up the matter until after she was already terminated. NPP contends that Doggett also confirmed with Hartman that Coe had notice of the December 11, 2006, meeting, as part of his investigation.

Doggett decided to let Coe's termination stand, apparently because he believed that Coe's allegations of sexual harassment by Burger had nothing to do with the performance problems for which she was being terminated. NPP contends, and Coe denies, that other employees were disciplined in comparable ways for misconduct comparable to the misconduct for which Coe was counseled and eventually terminated. Indeed, she contends that she was disciplined for conduct for which other drivers received only reprimands or no consequences at all. Coe admits, however, that one male truck driver was also discharged for missing a mandatory meeting.

## B. Procedural Background

### 1. Coe's claims

Coe filed a charge of sex discrimination and retaliation with the Iowa Civil Rights Commission (ICRC) on January 17, 2007, and that charge was cross-filed with the United States Equal Employment Opportunity Commission (EEOC). After Coe received a right-to-sue letter, she filed her Complaint (docket no. 1) in the present action against NPP on September 24, 2007.

In her Complaint, Coe asserts two claims pursuant to 42 U.S.C. § 2000e *et seq*. In **Count I**, Coe alleges a claim of "sex discrimination" based on allegations that, on

several occasions, she was subjected to unwelcome sexual advances and that she suffered adverse employment action when her employment was terminated for refusing those sexual advances. The parties have consistently referred to Coe's claim in **Count I** as a "*quid pro quo* harassment" claim. In **Count II**, Coe alleges a claim of "retaliation" based on allegations that she opposed discrimination in the workplace and suffered adverse employment actions for such opposition. NPP filed its Answer (docket no. 3) denying Coe's claims and asserting various defenses on November 11, 2007. Trial in this matter is currently set to begin on February 9, 2009.

### 2. *NPP's motion for summary judgment*

Eventually, on September 19, 2008, NPP filed the Motion For Summary Judgment (docket no. 15) now before the court in which NPP seeks summary judgment in its favor on both of Coe's claims. Coe filed her Resistance (docket no. 22) to NPP's motion on October 31, 2008, and her supporting brief on November 4, 2008 (docket no. 27; redocketed as docket no. 22-13). NPP filed a Reply (docket no. 31) in further support of its summary judgment motion on November 14, 2008.

Both parties requested oral arguments on the motion, although NPP's request did not fully comply with N.D. IA. L.R. 7.c. or 56.g. The court agreed that oral arguments were likely to be helpful to the court in the disposition of the motion, so by order (docket no. 30) dated November 10, 2008, the court set oral arguments on the motion for November 21, 2008. In its order setting oral arguments, the court also advised the parties that, from its review of the record and the briefs filed thus far, the court found that the parties should be prepared to focus their oral arguments on the following issues: (1) what conduct is sufficient to constitute "sexual advances" and what connection between such conduct and an employment benefit or detriment is sufficient to support a *quid pro quo* sexual harassment claim; and (2) the extent of the influence that an employee with an

alleged discriminatory animus must exercise over a purportedly independent decisionmaker's adverse employment decision toward the plaintiff for liability to be imposed upon the employer under the so-called "cat's paw" theory. As to the latter question, the court directed the parties to consider both the formulation of the "cat's paw" theory under Eighth Circuit law, including *Richardson v. Sugg*, 448 F.3d 1046, 1059-60 (8th Cir. 2006); *Dedmon v. Staley*, 315 F.3d 948, 949 n. 2 (8th Cir. 2003); *Kramer v. Logan County Sch. Dist. No. R-1*, 157 F.3d 620, 624-25 (8th Cir. 1998); and *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 725 (8th Cir. 1998), and the various formulations of that theory identified in the recent decision of the Tenth Circuit Court of Appeals in *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484-89 (10th Cir. 2006) (citations omitted), *cert. granted*, 127 S. Ct. 852, *and cert. dismissed*, 127 S. Ct. 1931 (2007).

At the oral arguments on November 21, 2008, plaintiff Melody Coe was represented by Mark D. Sherinian of Sherinian & Walker Law Firm in West Des Moines, Iowa. Defendant NPP was represented by Todd E. Zimmerman, who argued the motion on NPP's behalf, of Dorsey & Whitney, L.L.P., in Fargo, North Dakota, and Angela E. Dralle of Dorsey & Whitney, L.L.P., in Des Moines, Iowa.

This matter is now fully submitted.

## II.  LEGAL ANALYSIS

### A.  Standards For Summary Judgment

#### 1.     General principles

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One

of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . .").  Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case.  FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time").  Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248.  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could

return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it

is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present, the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is

to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

### 2. *Disregard of evidence from "interested" or "impeached" witnesses*

As the court noted above, Coe contends that certain statements of fact offered by NPP cannot be accepted as undisputed, simply because "[t]he only testimony upon which [such] assertion[s] [are] made is that of an interested and/or impeached witness and therefore the facts cannot be assumed to be true for the purposes of this motion." Thus,

Coe argues that all she has to do to generate a genuine issue of material fact is to assert that the person to whom the movant attributes the factual contention in question is "interested" or has been "impeached." In support of this contention, Coe cites *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). The court does not agree with Coe's contention.

Rule 56 of the Federal Rules of Civil Procedure expressly imposes upon a party resisting summary judgment an obligation to respond to the moving party's assertions that certain facts are undisputed by pointing to contrary *facts*, as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e)(2). Thus, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley*, 415 F.3d at 910 (quoting *Krenik*, 47 F.3d at 957). To put it another way, Rule 56 *requires* the party opposing summary judgment to point to *record evidence* or affidavits setting out specific facts that demonstrate the basis for a factual dispute. Similarly, a local rule of this court requires citation to parts of the record demonstrating the basis for a factual dispute, as follows:

> A response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record. The failure to respond, with appropriate

21

> citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.

N.D. Iₐ. L.R. 56.b.2. Thus, the local rule is consistent with the federal rule, because the local rule specifies the manner in which the resisting party must marshal evidence "set[ting] out specific facts showing a genuine issue for trial." Fₑd. R. Cᵢᵥ. P. 56(e)(2). While both the federal rule and the local rule plainly contemplate that the resisting party must point to *evidence* to generate a genuine issue of material fact, neither rule appears to contemplate that a resisting party may simply assert that a witness who stated the fact in question is "interested" or "impeached" to generate a genuine issue of material fact.

Coe's contention appears to be that a resisting party has made a sufficient demonstration of the basis for a factual dispute simply by pointing out that the fact in contention has been stated by an "interested" or "impeached" witness. In *Reeves*, on which Coe relies, the Supreme Court stated that, in deciding whether to grant judgment as a matter of law (or summary judgment), a district court "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S. at 151 (quoting 9A Cₕₐᵣₗₑₛ A. Wᵣᵢgₕₜ ₐₙd Aᵣₜₕᵤᵣ R. Mᵢₗₗₑᵣ, Fₑdₑᵣₐₗ Pᵣₐcₜᵢcₑ ₐₙd Pᵣₒcₑdᵤᵣₑ: Cᵢᵥᵢₗ § 2529 at 300 (2d ed. 1995)). At first blush, this statement does appear to support Coe's contention. Various courts have rejected such a reading of the statement in *Reeves*, however.

First, the Eighth Circuit Court of Appeals, whose authority is controlling on this court, has read this language from *Reeves* to "intimat[e] that there are some cases in which uncontroverted testimony from an interested party could be given credence," although the court was unsure whether it was presented with such a case. *Wilcox v. State Farm Mut. Auto. Ins. Co.*, 253 F.3d 1069, 1070-71 (8th Cir. 2001). Despite its uncertainty, the court

concluded that, where the resisting party was given a clear opportunity to contradict the "interested" party's affidavit, but did not do so, "it would not be obvious error to include the affidavit's contents in the factual mix relevant to summary judgment." *Id.* Here, where Coe has clearly been presented with the factual assertions of witnesses that she believes are "interested" in NPP's statements of facts, and has been given a clear opportunity to contradict those factual assertions by filing a response to NPP's statements of facts, but has not attempted to contradict those assertions with other evidence, as contemplated by Rule 56(e)(2) and N.D. IA. L.R. 56.b.2., and has, instead, merely asserted that the witnesses are "interested," this court concludes that it may consider the "interested" witnesses' factual assertions in its disposition of the summary judgment motion. *Wilcox*, 253 F.3d at 1070-71.

Coe also argues that the court should disregard the testimony of witnesses who have been "impeached." Specifically, Coe contends that Doggett has been impeached by his admission in deposition testimony that NPP's statement to the Iowa Civil Rights Commission was not complete, because it did not include information that Burger had invited Coe to his motel room, even though both Doggett and Burger knew that to be the case. The court believes that the decision in *Wilcox* also undermines Coe's assertions concerning "impeached" witnesses, however. Again, Coe attempts to use "impeachment" of a witness generally as the basis for disregarding that witness's testimony as to particular facts, just as she attempts to use the witness's "interest" generally as the basis for disregarding that witness's testimony as to particular facts. Again, *Wilcox* strongly suggests that, where the resisting party has been given a clear opportunity to contradict the "impeached" witnesses' specific factual assertions, as is the case here, but has not done so, and has, instead, merely asserted that the witnesses have been "impeached" generally, but not as to the specific factual assertions in question, this court concludes that it may

consider the "impeached" witnesses' factual assertions in its disposition of the summary judgment motion. *Cf. id.*

Other Circuit Courts of Appeals that have considered the import of the pertinent language from *Reeves* have also concluded that the focus is whether or not the specific proffered statements of fact of a witness are "controverted" or "contradicted," rather than whether or not the witnesses making the statements are "interested" or "impeached" generally. For example, the Seventh Circuit Court of Appeals has concluded that *Reeves* should not be interpreted "so broadly as to require a court to ignore the uncontroverted testimony of company employees or to conclude, where a proffered reason is established through such testimony, that it is necessarily pretextual." *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002). That court reasoned,

> To so hold would essentially prevent any employer from prevailing at the summary judgment stage because an employer will almost always have to rely on the testimony of one of its agents to explain why the agent took the disputed action. Moreover, consistent with the plaintiff's ultimate burden of proof under *McDonnell Douglas*, a plaintiff cannot avoid summary judgment by merely claiming a jury could disbelieve the employer's reason. *Equal Employment Opportunity Commission v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994).

*Traylor*, 295 F.3d at 791. In that case, the court found that all that the plaintiff had done was assert that the jury could disbelieve the employer's reason for its action. Where the plaintiff had done nothing but offer her own conjecture to call the employer's explanation into doubt, the court found that summary judgment for the employer was appropriate. *Id.*

Similarly, the Fifth Circuit Court of Appeals rejected a plaintiff's contention that *Reeves* requires the court to disregard as "interested" witness testimony all testimony by managers involved in the employment decision. *Sandstad v. CB Richard Ellis, Inc.*, 309

F.3d 893, 898 (5th Cir. 2002). The court reasoned that the plaintiff's interpretation of *Reeves* "would in effect eliminate his burden to show that [the employer's] explanation is pretextual." *Id.* Indeed, citing *Traylor*, the Fifth Circuit Court of Appeals reasoned that "[t]he definition of an interested witness cannot be so broad as to require us to disregard testimony from a company's agents regarding the company's reasons for discharging an employee," because to so hold would foreclose the possibility of summary judgment for employers. *Id.*

The Sixth Circuit Court of Appeals has also found that a litigant "misinterprets the import of this language" from *Reeves* when the litigant asserts that it means "that courts may never consider affidavits of interested persons when the affidavits are submitted by the moving party." *Statienko v. Cordis Corp.*, 249 F.3d 592, 597-98 (6th Cir. 2005). The court explained this conclusion as follows:

> This court has already considered this issue in *Almond v. ABB Indus. Sys., Inc.*, 56 Fed.Appx. 672, 2003 WL 173640 (6th Cir. Jan.22, 2003) (per curiam), and held that courts can consider the testimony of a moving party's interested witnesses. The court held that the interpretation of *Reeves* advocated by [the plaintiff] "leads to absurd consequences" because defendants will often be able to respond only through the testimony of their employees. *Almond,* 56 Fed.Appx. 672, 2003 WL 173640, at *2. To support its conclusion, the *Almond* court cited additional language from *Federal Practice and Procedure*: "The testimony of an employee of [the movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence . . . ." Wright & Miller at 287 n. 9. *Almond*'s holding is consistent with *Chesapeake & Ohio Ry. v. Martin,* 283 U.S. 209, 218, 51 S. Ct. 453, 75 L.Ed. 983 (1931), in which the Supreme Court stated that courts need not deny the conclusiveness of testimony of the moving party that

> "is not contradicted by direct evidence, nor by any legitimate inferences from the evidence[,]" because the rule requiring that testimony be considered by the jury is not "an absolute and inflexible one." *Almond* and *Chesapeake* establish that the issue, therefore, is not whether the district court could consider the affidavits of [the moving party] but instead whether the affidavits were uncontradicted.

*Stratienko*, 429 F.3d at 598; *see also Lauren W. ex rel. Jean W. v. Deflaminis*, 480 F.3d 259, 271-72 (3d Cir. 2007) (noting that, notwithstanding the language in *Reeves*, "[t]he fact is that in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness," because if the court does not do so, "then, contrary to all precedent, [the court] would allow the non-moving party to defeat the motion with mere allegations," and finding that the resisting party had failed to produce sufficient evidence to establish necessary genuine issues of material fact).

This court concludes that, notwithstanding the language from *Reeves* on which Coe relies, she was required to do more than simply assert that witnesses are "interested" or "impeached" generally to generate genuine issues of material fact on statements of fact attributed to those witnesses. Instead, she was required to controvert their statements of fact with other evidence. Where she has not attempted to contradict those statements of fact with other evidence, as contemplated by Rule 56(e)(2) and N.D. Iᴀ. L.R. 56.b.2., and has, instead, merely asserted that the witnesses are "interested" or "impeached" generally, this court concludes that it may consider the "interested" witnesses' factual assertions in its disposition of the summary judgment motion. *Wilcox*, 253 F.3d at 1070-71; *accord Stratienko*, 429 F.3d at 598; *Deflaminis*, 480 F.3d at 271-72.

### 3.    *Special concerns in employment discrimination cases*

The court recognizes "that summary judgment is disfavored in employment discrimination cases." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005); *see Woods v. Perry*, 375 F.3d 671, 674 (8th Cir. 2004) ("[S]ummary judgment should be used sparingly in employment discrimination cases . . . ."); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("[S]ummary judgment should seldom be used in employment discrimination cases.").   This exceptional deference shown the nonmoving party is warranted, according to the Eighth Circuit Court of Appeals, "[b]ecause discrimination cases often turn on inferences rather than on direct evidence . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and because "intent" is generally a central issue in employment discrimination cases.   *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson*, 425 F.3d at 542 (noting summary judgment is disfavored in employment discrimination cases becuase they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))).   Nonetheless, this exercise of judicial prudence "cannot and should not be construed to exempt" from summary judgment, employment discrimination cases involving intent.   *Christopher*, 137 F.3d at 1071 (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 959 (8th Cir. 1995)).   The fact remains that "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).   The court will apply these standards to NPP's Motion For Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII—than during Title VII's earlier evolution. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII). This court's experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible

reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.*

Consequently, with both the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment.

### B. The Nature Of Coe's "Sex Discrimination" Claim

Coe describes the claim in **Count I** of her complaint as "sex discrimination." Throughout their briefing of NPP's motion for summary judgment, however, both parties have consistently described this claim as a "*quid pro quo* harassment" claim. Thus, the first issue for the court is whether Coe's "sex discrimination" claim can be construed as a "*quid pro quo*" claim.

### 1. Quid pro quo *versus hostile environment harassment*

As the Eighth Circuit Court of Appeals has explained,

> [I]t is clear that in enacting Title VII, Congress aimed to eliminate the entire spectrum of disparate treatment of men and women in the workplace. *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707 n. 13, 98 S. Ct. 1370, 55 L. Ed. 2d 657 (1978). Accordingly, in interpreting the

meaning of "sex discrimination," the Supreme Court has expanded Title VII's reach beyond simply prohibiting employers from making distinctions between employees based on their gender. *Meritor,* 477 U.S. at 64-65, 106 S. Ct. 2399. Title VII now prohibits both quid pro quo harassment, where an employee's submission to or rejection of a supervisor's unwelcome sexual advances is used as the basis for employment decisions, and hostile work environment harassment, where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (quotations omitted).

*Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 907-08 (8th Cir. 2006). Although Title VII prohibits both *quid pro quo* harassment and hostile environment harassment, the Eighth Circuit Court of Appeals has also recognized that "a claim of quid pro quo harassment often adds little to a straightforward Title VII analysis," because "[b]oth quid pro quo and hostile work environment sexual harassment claims are grounded in the same legal theory under Title VII, the former involving an explicit, and the latter a constructive, change in conditions of employment." *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004) (citing *Forshee v. Waterloo Industries, Inc.*, 178 F.3d 527, 530 (8th Cir. 1999), for the first proposition, and *Burlington Industries v. Ellerth*, 524 U.S. 742, 752, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), for the second); *see also Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1006 (8th Cir. 2000) ("[I]n 'supervisor harassment' cases such as this, the terms 'quid pro quo' and 'hostile environment' remain relevant only to the extent they illustrate the evidentiary distinction between cases involving threats which are carried out and those featuring offensive conduct in general. *Burlington Indus., Inc. v.*

*Ellerth,* 524 U.S. 742, 751-54, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). Once a plaintiff proves discrimination under either theory, we turn to the standards announced by the Supreme Court in *Ellerth* and *Faragher* to determine whether the employer may be held liable for the supervisor's conduct.").

There are other differences between a *quid pro quo* claim and a hostile environment claim, in addition to the distinction between an explicit and a constructive change in conditions of employment:

> Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a supervisor's sexual demands. [*Ellerth*, 524 U.S. at 752]; *Forshee*, 178 F.3d at 530. A plaintiff in that situation need not prove that the offensive conduct is severe or pervasive because any carried-out threat is itself deemed an actionable change in the terms or conditions of employment. *Ellerth*, 524 U.S. at 753-54, 118 S. Ct. 2257.

*Henthorn*, 359 F.3d at 1026-27. Thus, to avoid summary judgment on a *quid pro quo* harassment claim, the plaintiff must present evidence capable of proving that "submission to unwelcome advances was an express or implied condition for receiving job benefits or [that] refusal to submit resulted in a tangible job detriment." *Newton v. Cadwell Labs.*, 156 F.3d 880, 882 (8th Cir. 1998) (last element of a *prima facie* case of *quid pro quo* harassment).

On the other hand,

> To overcome summary judgment on [a] hostile work environment claim, [the plaintiff] must present evidence from which a reasonable jury could find that [the alleged harasser's] conduct towards her was more than merely offensive, immature or unprofessional, for conduct that does not exceed that threshold of severity is insufficient to constitute a prima facie case of sexual harassment. *See, e.g., Duncan [v.*

> General Motors Corp., 300 F.3d 928 [(8th Cir. 2002)] (finding
> plaintiff failed to prove a hostile work environment claim when
> she was asked out, criticized, asked to sketch pottery with a
> sexual theme, and unnecessarily touched on the hand); *Alagna
> v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir.
> 2003) (finding to be inappropriate but not actionable conduct
> that involved frequent calls to plaintiff's home, regular visits
> to her office, the bestowing of gifts, the touching of plaintiff's
> arm, and the frequent expressions of "I love you"). The
> conduct "must be extreme and not merely rude or unpleasant"
> before it can be said to have, in an objective sense, affected
> the terms and conditions of employment. *Alagna*, 324 F.3d at
> 980.

*Henthorn*, 359 F.3d at 1027 (footnote omitted).

In short, "[t]o prevail on her quid pro quo claim, [the plaintiff] need[s] to prove (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment." *Ogden*, 214 F.3d at 1006 n.8 (citing *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir. 1995)). "To prevail on her hostile environment claim, [the plaintiff] need[s] to prove (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of her employment. *Id.* at 1006 n.9 (citing *Schmedding v. Tnemec Co., Inc.,* 187 F.3d 862, 864 (8th Cir. 1999)). For purposes of a hostile environment claim, "[h]arassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an objectively hostile or abusive work environment." *Id.* (internal quotation marks and citations omitted).

## 2. Coe's claim

Because Coe never argues that the conduct to which Burger allegedly subjected her in October 2006 was sufficiently "severe or pervasive" to constitute actionable sexual harassment, *i.e.*, to create a sexually hostile work environment, in the absence of evidence of a relationship between the conduct and receiving a job benefit or suffering a tangible job detriment, the court concludes that Coe has limited her "sex discrimination" claim to a harassment claim of the *quid pro quo* variety. *Id.* (distinguishing between a *quid pro quo* claim and a hostile environment claim on this basis); *see also Tenge*, 446 F.3d at 907-08 (only a hostile environment claim requires proof that the harassment was "severe and pervasive"; a *quid pro quo* claim does not); *Henthorn*, 359 F.3d at 1027 (same). As indicated above, that determination also determines that precise proof that Coe must offer in support of her "sex discrimination" claim.

## C. Arguments Concerning Coe's **Quid Pro Quo** *Claim*

Having determined that Coe's "sex discrimination" claim is properly described as a "*quid pro quo*" claim, the court turns to NPP's contention that it is entitled to summary judgment on that claim. The court's analysis begins with a summary of the parties' arguments for and against summary judgment on Coe's *quid pro quo* claim.

### 1. NPP's initial argument

In support of its motion for summary judgment on Coe's sex discrimination claim, which NPP consistently identifies as a *quid pro quo* claim, NPP argues that it is entitled to summary judgment for three independent reasons. First, NPP contends that Coe has no evidence that her termination was linked in any way to any allegedly improper conduct, because the employee who made the decision to terminate her, Ken Doggett, had no knowledge of any supposed misconduct until *after* he confirmed to Coe that she was being

terminated, and Doggett made the termination decision solely on the basis of performance issues. Second, NPP contends that, even accepting Coe's version of the pertinent events, Coe has no evidence of a sexual advance sufficient to support a *quid pro quo* claim, where there was no sexual proposition, no touching, and no threat of adverse employment action. Third, NPP argues that it cannot be held either vicariously or directly liable for the alleged harassment, because the alleged harasser was not a managerial employee, NPP had no knowledge of the supposed harassment, and any harassment was directly contrary to clear company policies well known to all involved.

### 2.    *Coe's response*

Coe counters NPP's first argument by asserting that, even though Doggett claims that he made the decision to terminate Coe, Doggett has admitted that the decision to terminate Coe was a "collaborative" decision with Burger, and that he made the decision with Burger's input, which was consistent with their normal practices. Coe also argues that NPP has offered no objective evidence that only Doggett had authority to hire or terminate employees, but Burger did not. Thus, Coe argues that there is sufficient evidence the Burger caused her termination under a "cat's paw" theory. She also argues that Burger had granted her a week off, because her truck had broken down and the part necessary to repair the truck would not be in for a week, but that Burger failed to disclose to Doggett that he had done so when Doggett investigated Coe's failure to attend the mandatory meeting in December 2006. Thus, Coe argues that a reasonable jury could conclude that Doggett would not have terminated her had he known that Burger had given her permission to take the week off and that Burger failed to inform Doggett that he had given Coe the time off, because she had refused to accept his sexual advances. Coe also argues that there is sufficient evidence to support her claim that her refusal to accept Burger's sexual advances caused her termination, because of evidence that Burger's

attitude toward her changed after she rebuffed his advances in October 2006; evidence that Burger disciplined her for conduct for which he did not discipline male employees; evidence that the reasons offered by NPP for terminating her kept changing over time; and evidence that the reasons for her termination offered by NPP are insufficient or untenable. At the very least, Coe argues that the record is sufficient to support a "mixed motives" analysis.

Coe also argues that she has presented evidence of sexual advances sufficient to support a *quid pro quo* sexual harassment claim. She points to evidence the Burger invited her to engage in sexual activity with him in October 2006 and that Burger's conduct was not "innocent" or "innocuous," as NPP contends, even if no direct sexual solicitation occurred, because the cumulative effect of Burger's conduct is that he made unwelcome sexual advances. Indeed, she contends that both Doggett and Burger have acknowledged that the conduct in which Burger engaged in October 2006 could be considered a violation of NPP's anti-harassment policy, and that Doggett criticized Burger at the time that he learned of Burger's conduct, because he believed that such conduct could be considered a solicitation of a female employee by a male supervisor.

Coe also argues that NPP can be held liable for the sex discrimination to which she was subjected, because Burger was her supervisor and did participate in the adverse employment decision against her. She argues that Burger held the title of Traffic *Manager* and considered himself part of management and that he also had the authority to hire, fire, and discipline employees. Specifically, she argues that Burger participated in the decision to hire her, he exercised discipline over her, and he participated in the decision to terminate her. She also points out that, although Doggett claims to be the decisionmaker, Doggett admits that the decision to terminate her was a "collaborative" decision with Burger involving Burger's input. She also points to the absence of any evidence of a

company policy or directive that demonstrates that only Doggett had the authority to hire or terminate employees or that Burger did not. Thus, she contends that NPP can be held vicariously liable for discrimination by Burger. She argues that NPP's anti-discrimination policy does not insulate it from liability, because Doggett effectively disregarded that policy by failing to investigate adequately her allegations of discrimination.

### 3. *NPP's reply*

In reply, NPP argues that it is undisputed that Doggett made the adverse employment decisions to give Coe a letter of counseling in early December 2006 for performance problems and to terminate her in mid-December 2006 for missing a mandatory meeting and that he did so with absolutely no knowledge of any alleged sexual advances by Burger to which Coe later claimed she had been subjected in October 2006. NPP also points out that, when Doggett told Burger that he wanted to fire Coe, Burger actually persuaded him to wait and to give Coe the benefit of the doubt until they learned Coe's reasons for missing the mandatory meeting and not responding to calls from the company. NPP argues that it was Doggett, not Burger, who eventually insisted upon Coe's termination. Thus, NPP contends that, not only did Burger not initiate or cause any disciplinary action toward Coe or cause her termination, but Doggett was an entirely "independent" decisionmaker in taking such actions based on his personal knowledge of the events upon which those adverse employment actions were based. NPP also argues that Coe is not entitled to a "mixed motives" analysis, because she has presented no evidence that Doggett had any discriminatory reason, in addition to his stated non-discriminatory reasons, for terminating Coe. NPP also argues that Coe's attempts to second-guess Doggett's decision and her attempt to show that his decision was a pretext based on supposedly different treatment are unavailing, because Coe's misconduct fully justified the actions taken against her.

NPP also reiterates its contention that no conduct by Burger rose (or sank) to the level of sexual advances sufficient to support Coe's *quid pro quo* discrimination claim. NPP again points to the absence of any explicit demand for sexual favors or threat of retaliation for rebuffing such advances. In short, NPP argues that Burger's one-time invitation to Coe to come to his motel, without any reference to employment or any threat, simply is insufficient to support Coe's claim.

### 4.     *The parties' oral arguments*

The parties' oral arguments on November 21, 2008, were, for the most part, consistent with their written arguments. As to the questions that the court specifically asked the parties to be prepared to address, NPP argued that a single social invitation not involving any direct request for sex, and no reference at all to employment or adverse consequences of refusal, is simply not enough to support a *quid pro quo* claim. Indeed, NPP argued that the plaintiff needs to show that there was a threat to retaliate against the plaintiff for failure to submit to sexual advances and that the threat was actually carried out. NPP also argued that the decision in *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021 (8th Cir. 2004), on which it had also relied for other reasons in its briefing, was instructive on "cat's paw" liability, even though it never used the term, because in that case, there was a supposedly biased subordinate, but the principal supervisor knew nothing of improper conduct by the subordinate, and insisted on disciplining and terminating the plaintiff for legitimate reasons. NPP argued that the same is true here. NPP also argued that all of the Circuit Courts of Appeals require that, for "cat's paw" liability, there must be some evidence that the biased subordinate influenced or used the actual decisionmaker as a conduit for his biased actions, but the evidence here shows that Doggett, the decisionmaker, drove the termination decision, and that Burger, the allegedly biased

subordinate, simply went along with it. Thus, NPP described the circumstances here as something of a "reverse cat's paw" situation.

On the other hand, Coe reiterated at oral arguments her contention that all of the circumstances and their cumulative effect are relevant to the determination of whether there had been sexual advances that would support a *quid pro quo* claim. She argues that a reasonable jury could conclude from all of Burger's conduct in October 2006 and thereafter that he was making sexual advances and that, when those advances were rebuffed, he retaliated with unwarranted disciplinary actions and a scheme to get her terminated by failing to disclose to Doggett that he had given her time off the week that she missed the mandatory meeting. As to "cat's paw" liability, Coe reiterated her contentions that the record shows, and that NPP has conceded, that Burger and Doggett collaborated in the adverse employment actions against her, and again, that Burger's failure to disclose to Doggett that he had given her time off the week that she missed the meeting was using Doggett to effect adverse employment actions against her for rebuffing his advances. She argues that, had Burger disclosed that he had given her time off, Doggett's decision to terminate her would likely have been different.

The parties' arguments raise several distinct issues, which the court will consider in turn.

### D.  Actionable Sexual Advances

Although it is not NPP's first contention, the court finds that it should consider first NPP's argument that, even accepting Coe's version of the pertinent events, Coe has no evidence of a sexual advance sufficient to support a *quid pro quo* claim, where there was no sexual proposition, no touching, and no threat of adverse employment action. *See Ogden*, 214 F.3d at 1006 n.8 (to prove a *quid pro quo* claim, the plaintiff must first prove

that there were unwelcome sexual advances or requests for sexual favors, then prove that her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment). NPP is mistaken about what Coe must prove and what the record here may reasonably show.

### 1. Demands for sexual favors

NPP argues that Burger made no explicit demand for sexual favors and that his one-time invitation to Coe to come to his motel room is not sufficient to support Coe's *quid pro quo* claim. A *quid pro quo* claim does not require an explicit sexual proposition, however, because proof of sexual advances will suffice. *Ogden*, 214 F.3d at 1006 n.8 (a *quid pro quo* claim requires proof that the plaintiff "was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors"). Nor is there any requirement that a single incident be sufficient to support a *quid pro quo* claim, as NPP contends. As this court has previously explained, "[I]t is important to realize that just because the alleged behavior was inappropriate does not mean that it amounted to a request for sexual favors or a sexual advance," but it is "[e]qually important [to] realiz[e] that incidents that may merely be nothing more than 'inappropriate' standing alone, when considered cumulatively, can generate genuine issues of material fact as to this element." *Soto v. John Morrell & Co.*, 285 F. Supp. 2d 1146, 1174 (N.D. Iowa 2003) (citing cases). Thus, there is no requirement of an explicit sexual proposition to support a *quid pro quo* claim and even conduct that is merely "inappropriate," considered cumulatively, may suffice to demonstrate a sexual advance on which such a claim can be based.

### 2. Touching

NPP also argues that Coe's *quid pro quo* claim fails, because the purported sexual advances involved no touching. The fact that no touching occurred is not determinative of whether a sexual advance sufficient to support a *quid pro quo* claim occurred. Even in

the context of a hostile environment claim, where the sexually charged conduct must be "severe or pervasive," *see Ogden*, 214 F.3d at 1006 n.9, whether or not touching occurred is only a relevant factor for determining whether actionable conduct has occurred, not a requirement. *See, e.g., Barker v. Missouri Dep't of Corrections*, 513 F.3d 831, 835 (8th Cir. 2008) ("'[W]hether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances' including the frequency, physicality and severity of the conduct.") (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)). Again, the issue for a *quid pro quo* claim is whether the cumulative effect of the conduct in question is such that the conduct amounts to a sexual advance or request for sexual favors, not whether "severe" sexual conduct or touching occurred. *Ogden*, 214 F.3d at 1006 n.8.

### 3.    Coe's evidence of sexual advances

Here, Coe has identified numerous incidents the cumulative effect of which could lead a reasonable juror to conclude that Burger was soliciting sexual favors from Coe or making sexual advances toward her. Those incidents include Burger's suggestive laughter with his comment that he was at Coe's house in his cell phone call to Kluth; Burger's following Coe down the hallway to her bedroom during his first visit to her house, coupled with his flipping on the lights in the bedroom after Coe had already exited the room and his inquiry about whether the room was Coe's bedroom; Burger's repeated calls to Coe to ask if she wanted company; Burger's concluding a call in which Coe said that she was in bed with "sweet dreams": Burger's unsolicited appearance on Coe's doorstep; and Burger's requests that Coe come visit him at his motel room. Although NPP can and does offer "innocuous" explanations or versions of each of these incidents, a reasonable juror would not have to accept those explanations or versions on the record evidence and could find that the cumulative effect of these incidents is such that Coe reasonably felt that she

was being subjected to unwelcome sexual advances by Burger. *See Soto*, 285 F. Supp. 2d at 1174 (the cumulative effect of merely "inappropriate" conduct may suffice to show sexual advances upon which a *quid pro quo* claim can be based).

Nevertheless, NPP argues that, in *Henthorn*, the Eighth Circuit Court of Appeals held that a supervisor's late-night and early morning calls urging the plaintiff to accept his social invitations and expressing interest did not contain sexual propositions and were not considered sexual advances for purposes of the plaintiff's *quid pro quo* claim. NPP's reliance on *Henthorn* is misplaced, however, because the conduct in *Henthorn* to which NPP refers was found inadequate to support the plaintiff's *hostile work environment* claim, not her *quid pro quo* claim. Specifically, the court held, as follows:

> Having examined the totality of the circumstances, we conclude that although Parker's comments and actions were inappropriate, immature, and unprofessional, they did not cross the high threshold required to support a claim of sexual harassment. Parker's requests that Henthorn go out with him were repetitive and annoying, but they were not lewd or threatening. Parker did not touch Henthorn inappropriately, nor did he make sexual comments about her in her presence. His two late-night/early morning calls urged her to accept his social invitations and expressed his interest in her, but they did not contain sexual propositions. Although Henthorn was made uncomfortable by Parker's conduct, she was able to continue to perform her assignments, and Parker's actions did not result in a change of her probationary status. Accordingly, we conclude that the district court did not err in ruling that Henthorn had failed to establish the existence of a trial-worthy question of fact on her hostile work environment claim.

*Henthorn*, 359 F.3d at 1027-28 (footnote omitted). Again, because a hostile environment claim requires "severe or pervasive" harassment, and a *quid pro quo* claim does not, *see id.* at 1027 (a plaintiff asserting a *quid pro quo* claim "need not prove that the offensive

41

conduct is severe or pervasive because any carried-out threat is itself deemed an actionable change in the terms or conditions of employment"), a finding that certain evidence was insufficiently severe to support a hostile environment claim provides no insight at all as to whether that conduct is sufficient to support a *quid pro quo* claim.

In *Henthorn*, the court found that the plaintiff's *quid pro quo* claim failed for a different reason than that asserted by NPP. The court held that, "although [the alleged harasser] told [the plaintiff] that he would tear up her first negative job performance memo if she would have a drink with him, his conditional promise/implied threat proved to be hollow in light of his destruction of the memo despite [the plaintiff's] refusal to accede to his request," and that, consequently, there was "no actionable change in [the plaintiff's] employment." *Id.* Thus, in *Henthorn*, the plaintiff's *quid pro quo* claim failed for lack of an actionable change in the plaintiff's employment, not for the insufficiency of the conduct in question to amount to a sexual advance. Indeed, the court in *Henthorn* never suggested that the alleged harasser's invitation to the plaintiff to have a drink with him was not a sufficient sexual advance to support a *quid pro quo* claim. *Id.*

Here, much like the alleged harasser in *Henthorn*, who made an invitation to the plaintiff to have a drink with him, Burger made an invitation to Coe to come to his motel room, which Coe points out even Doggett and Burger recognized was conduct that might fall within the prohibitions in NPP's anti-harassment policy and which Doggett recognized might be misconstrued. Thus, in light of this evidence and the cumulative effect of other evidence of Burger's conduct toward Coe in October 2006, the court reiterates its conclusion that Coe has generated genuine issues of material fact as to whether she was subjected to sexual advances that would support a *quid pro quo* claim.

### E.  The Connection Between The Advances And The Job Detriments

To defeat NPP's motion for summary judgment on her *quid pro quo* claim, Coe must also generate genuine issues of material fact as to the last element of such a claim, that the plaintiff's "submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment." *See Ogden*, 214 F.3d at 1006 n.8.  NPP contends that Coe cannot make the necessary showing, because the alleged harasser must tie the request for sexual favors to a job benefit or detriment and make a threat of retaliation for rebuffing sexual advances to establish a *quid pro quo* claim, but there is no evidence that Burger did these things in this case.  NPP again relies on *Henthorn* for this contention.

The court notes that the circumstances in *Henthorn* are distinguishable from those presented here in that the alleged harasser in *Henthorn* did explicitly tie acceptance of his social invitation to the employment benefit of tearing up a negative job performance memorandum, *see Henthorn*, 359 F.3d at 1027, but Burger did not explicitly tie Coe's acceptance of his invitations to any job benefit.  That distinction is not dispositive of Coe's *quid pro quo* claim in NPP's favor, however.  As this court has previously observed, the last element of a *quid pro quo* sexual harassment claim must be read in the disjunctive to require *either* that job benefits were conditioned on submission to the harasser's sexual requests or advances, *or* that refusal to submit resulted in a tangible job detriment.  *Soto*, 285 F. Supp. 2d at 1173 (the parties agreed that there had been no explicit demand for sexual favors nor an explicit tying of submission to sexual advances to a job benefit or detriment) & 1175 (holding that the plaintiff must prove *either* conditioning of a job benefit on submission to sexual advances or a tangible job detriment resulting from refusal of advances); *see also Ogden*, 214 F.3d at 1006 n.8 (stating the last element in the alternative).  Coe has pointed to evidence that, after she rebuffed Burger's advances, his

attitude toward her changed, in that he became sarcastic and argumentative with her and ceased initiating telephone calls to her about business or anything else, and, more importantly, that he orchestrated her termination for failing to attend a mandatory meeting by failing to inform Doggett that he had given her time off the week that the meeting occurred while her truck was being repaired and otherwise by participating in the decision to terminate her. This evidence would be sufficient to generate a genuine issue of material fact as to whether Coe's refusal to submit to Burger's sexual advances resulted in a tangible job detriment, if Burger was actually responsible for any tangible job detriment to Coe, and consequently, and in those circumstances, would be sufficient to generate genuine issues of material fact on one alternative for the last element of a *quid pro quo* claim. *See id*.

## F. Independent Decisionmakers And "Cat's Paws"

NPP argues, however, that Burger did not impose any tangible job detriment on Coe, because the tangible job detriments of the December 5, 2006, counseling and the December 14, 2006, termination were imposed for Coe's performance problems by Doggett, an independent decisionmaker with no knowledge, until after the pertinent decisions had been made, of any alleged sexual advances by Burger. Coe argues that Doggett simply acted as Burger's "cat's paw" to effect job detriments for Coe's refusal to submit to Burger's sexual advances. These arguments bring the court to the unsettled question—in this and other circuits—of the extent of the influence that an allegedly biased subordinate must exercise over a purportedly independent decisionmaker who took adverse employment action against a plaintiff employee before a defendant employer can be held liable for discrimination under a "cat's paw" theory.

## 1. Formulations of the "cat's paw" rule

The Eighth Circuit Court of Appeals recently explained this circuit's rule for "cat's paw" liability in *Richardson v. Sugg*, 448 F.3d 1046 (8th Cir. 2006), as follows:

> This circuit's "cat's paw" rule provides that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Dedmon v. Staley,* 315 F.3d 948, 949 n. 2 (8th Cir. 2003). Where a decisionmaker makes an independent determination as to whether an employee should be terminated and does not serve as a mere conduit for another's discriminatory motives, the "cat's-paw" theory fails. *Lacks v. Ferguson Reorganized Sch. Dist. R-2,* 147 F.3d 718, 725 (8th Cir. 1998).

*Richardson*, 448 F.3d at 1060.[4]  "Cat's paw" liability is an "application of agency

---

[4]The Tenth Circuit Court of Appeals explained the derivation of the name for the theory and its general nature, as follows:

> The "cat's paw" doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat. Today the term "cat's-paw" refers to "one used by another to accomplish his purposes." In the employment discrimination context, "cat's paw" refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.

*EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citations omitted), *cert. granted*, 127 S. Ct. 852, *and cert. dismissed*, 127 S. Ct. 1931

(continued…)

principles in the Title VII context." *Kramer v. Logan County Sch. Dist. No. R-1*, 157 F.3d 620, 624 (8th Cir. 1998); *see also EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 485-86 (10th Cir. 2006) (opining that holding employers liable for subordinate bias on these theories comports with the basic agency principles incorporated by statute into Title VII and advances the purposes of Title VII, for example, because "a company's organizational chart does not always accurately reflect its decisionmaking process"), *cert. granted*, 127 S. Ct. 852, *and cert. dismissed*, 127 S. Ct. 1931 (2007). "Cat's paw" liability extends to the *employer*, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the plaintiff employee, but liability is not thereby imposed on the innocent *decisionmaker*. *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003) (also noting, "Although other circuits have stated that discriminatory or unlawful motive can be imputed to the formal decisionmaker, *see, e.g., Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226-27 (5th Cir. 2000), we think that is only for the limited purpose of determining whether the employer could be held liable. We found no case suggesting that an otherwise innocent decisionmaker could be personally liable for the discriminatory motive of another.").

In *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476 (10th Cir. 2006), an exceptionally thorough and thoughtful decision by Judge McConnell of the Tenth Circuit Court of Appeals on which certiorari was granted, but later dismissed, the court found that what was not consistent in the application of "cat's paw" theories by its sister courts was the level of control that a biased subordinate must exert over the employment decision to impose liability on the employer. That court found that the standards advanced

---

[4](…continued)
(2007).

ranged from a "lenient approach," in which the question is only whether the subordinate possessed leverage, or exerted influence, over the titular decisionmaker, to a more restrictive approach, in which an employer cannot be liable even if a biased subordinate exercised substantial influence or played a significant role in the employment decision, but can only be liable if the decisionmaker was so completely beholden to the subordinate that the subordinate was the actual decisionmaker. *BCI Coca-Cola Bottling Co.*, 450 F.3d at 486-87 (citing cases).

## 2.      Applications of the rule in this circuit

The problem with the necessary extent of the subordinate's influence is apparent in Eighth Circuit decisions considering "cat's paw" liability. Specifically, in *Richardson*, the Eighth Circuit Court of Appeals held that the plaintiff's "cat's paw" theory failed, because plaintiff Richardson's contract provided for independent review by defendant Sugg of any decision to fire Richardson, such review was "amply undertaken" by Sugg, and Sugg's own impression of alleged misconduct by Richardson provided an independent basis for his decision to approve Richardson's termination. 448 F.3d at 1060. The court held that, in such circumstances, Sugg, who had the final say on Richardson's termination, was not used as a "cat's paw" to act on someone else's allegedly discriminatory motive. *Id.* Thus, while *Richardson* makes clear that a decisionmaker's truly independent determination to terminate an employee defeats liability under a "cat's paw" theory, it provides no insight into how much influence a biased subordinate must exercise over the decisionmaker, so that the decisionmaker is not truly independent, to impose "cat's paw" liability on the employer.

Likewise, *Kramer* makes clear that the question for "cat's paw" liability, when the decisionmaker makes what is purportedly an independent determination, is "whether [the decisionmaker] accurately a[ss]essed [the plaintiff's] situation or performed a perfunctory

review and 'rubber stamped' the recommendation [for detrimental job action]." *Kramer*, 157 F.3d at 624. However, in *Kramer*, the court determined that answering the question "involve[s] credibility determinations," which courts do not consider on a motion for judgment as a matter of law or summary judgment. *Id.* (reviewing a motion for judgment as a matter of law); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 242, 250-51 (1986)). The court in *Kramer* found that a jury question was presented by the plaintiff's evidence that allegedly biased subordinates, acting within the scope of their employment, initiated the non-renewal of the plaintiff's contract, and made material misrepresentations and omissions in presenting their recommendation to terminate the plaintiff's contract to the decisionmaker, as well as evidence of the allegedly biased subordinates' disparate treatment of female employees. *Id.* Thus, *Kramer* makes clear that an express recommendation by a biased subordinate to a purportedly independent decisionmaker for detrimental job action against the plaintiff raises a jury question for employer liability under a "cat's paw" theory, at least where there is also a jury question as to how the decisionmaker assessed the situation. On the other hand, in *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718 (8th Cir. 1998), the court rejected a "cat's paw" theory, because the plaintiff "produced no evidence that the [decisionmaker] deferred to the opinion or judgment of [the allegedly biased subordinates] in making its determination," and neither of the allegedly biased subordinates expressly recommended that the decisionmaker terminate the plaintiff. *Lacks*, 147 F.3d at 725. Thus, while *Kramer* and *Lacks* may "bracket" the circumstances in which "cat's paw" liability does or does not apply, they nevertheless do not make clear precisely how much influence the allegedly biased subordinate must exercise over the

decisionmaker, short of expressly recommending detrimental job action, for "cat's paw" liability to apply. This is so, even though *Lacks* does suggest that the decisionmaker must, to some extent, defer to the opinion or judgment of the biased subordinate. *Lacks*, 147 F.3d at 725.

Perhaps more illuminating on the precise question at issue here is the decision of the Eighth Circuit Court of Appeals in *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316 (8th Cir. 1994), a decision that does not even mention "cat's paw" liability by name, but that nevertheless addresses the impact of an allegedly biased subordinate's influence upon an employment decision purportedly made by another. In *Stacks*, the plaintiff argued that the district court erred in failing to analyze her discharge claim under a *Price Waterhouse* "mixed motives" analysis and, in particular, that the district court erred in finding that one person, named Brown, was the sole relevant decisionmaker as to her discharge. 27 F.3d at 1323. The appellate court agreed:

> As made clear in our remand, evidence that gender was a motivating factor includes evidence of "[c]omments which demonstrate a discriminatory animus . . . uttered by individuals closely involved in employment decisions." [*Stacks v. Southwestern Bell Yellow Pages, Inc.*, 996 F.2d 200, 202 (8th Cir. 1993)] (quoting *Beshears [v. Asbill]*, 930 F.2d [1348,] 1354 [(8th Cir. 1991)]). This court has recently stated that "'[a]n employer cannot escape responsibility for [ ] discrimination . . ., when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of [women].' *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1057 (8th Cir. 1993) (quoting *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993)).
>
> Here, without doubt Hudson [the allegedly biased subordinate] was closely involved in the decision-making process at each step. At trial Hudson admitted that he participated in the decisions to suspend and terminate Stacks.

> "[T]he fact that [Hudson] did not 'pull the trigger' is of little consequence." *Simpson v. Diversitech Gen., Inc.,* 945 F.2d 156, 160 (6th Cir. 1991), *cert. dismissed,* 502 U.S. 1083, 112 S. Ct. 1072, 117 L. Ed. 2d 277 (1992).

*Stacks*, 27 F.3d at 1323. Thus, *Stacks* can be read to support the proposition that an allegedly biased subordinate's "participation" in the decision-making process, even if the subordinate did not "pull the trigger," is sufficient to impose liability on the employer, even if an ostensibly unbiased decisionmaker makes the ultimate decision for detrimental job action. While, as a factual matter, the alleged biased subordinate was involved in "each step" of the termination decision in *Stacks*, for the reasons discussed below, I do not read the *Stacks* decision as requiring involvement in "each step." Such a requirement for subordinate liability would be inconsistent with basic Title VII concepts of causation articulated by the Supreme Court and the "aided by the agency relation" principle embodied in Title VII.

### 3.     *The necessary extent of the biased subordinate's "participation"*

The necessary extent of the biased subordinate's "participation" in the decision-making process, however, remains a rather poorly defined concept. Again, as the Tenth Circuit Court of Appeals explained in *BCI Coca-Cola Bottling Co.*, the standards advanced in the various Circuit Courts of Appeals range from a "lenient approach," in which the question is only whether the subordinate possessed leverage, or exerted influence, over the titular decisionmaker, to a more restrictive approach, in which an employer cannot be liable even if a biased subordinate exercised substantial influence or played a significant role in the employment decision, but can only be liable if the decisionmaker was so completely beholden to the subordinate that the subordinate was the actual decisionmaker. *BCI Coca-Cola Bottling Co.*, 450 F.3d at 486-87 (citing cases).

In *BCI Coca-Cola Bottling*, the Tenth Circuit Court of Appeals adopted the Seventh Circuit standard, which requires the plaintiff to establish more than mere influence or input in the decisionmaking process and requires the plaintiff to show that the biased subordinate's discriminatory reports, recommendations, or other actions caused the adverse employment action. *Id.* at 487 (adopting this standard from the Seventh Circuit decision in *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004)); *see also Brewer v. Board of Trustees of Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007) ("[W]here a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker," and a "cat's paw" theory may not be viable). Under this standard, however, the Tenth Circuit Court of Appeals found that it is not necessary for the plaintiff to show that the decisionmaker received and approved an explicit recommendation from the biased subordinate to terminate an employee, as long as the plaintiff proves that the subordinate's actions in fact caused the termination. *Id.* at 488. The Tenth Circuit Court of Appeals explained that "[t]his standard comports with the agency law principles that animate the statutory definition of an 'employer,'" *id.* at 487 (citing RESTATEMENT (SECOND) OF AGENCY § 219 as describing the scope of a master's liability "for torts of his servants" and thereby incorporating standard tort concepts like causation), and noting that "[b]oth the Supreme Court and this Court require a comparable causal connection as part of analogous workplace discrimination claims." *Id.* at 487-88 (citing *Clark County Sch. Dist. v. Breeden*, 535 U.S. 268, 272 (2001), as requiring a "causal connection" between the plaintiff's protected activities and adverse employment action in a Title VII retaliation case, and *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994), as requiring a "causal nexus"

between allegedly discriminatory workplace statements and the termination decision in an ADEA case).

In *BCI Coca-Cola Bottling*, the Tenth Circuit Court of Appeals also reaffirmed its earlier decisions that, "because a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action, an employer can avoid liability by conducting an independent investigation of the allegations against an employee." *Id.* at 488 (citing *English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1011 (10th Cir. 2001)). The court explained that, where the employer had conducted an independent investigation, "the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated," noting that such a rule would give employers "a powerful incentive to hear both sides of the story before taking an adverse employment action against a member of a protected class." *Id.* (also noting that, "under our precedent, simply asking an employee for his version of events may defeat the inference that an employment decision was . . . discriminatory").

Finally, the Tenth Circuit Court of Appeals rejected the contention that a subordinate bias theory will only succeed if the decisionmaker receives and approves an explicit recommendation to terminate an employee:

> Regrettably, subordinate bias cases have suffered from an abundance of vivid metaphors. The Fourth Circuit, for example, seems to have taken the "cat's paw" metaphor too literally in deriving its total-control-over-the-actual-decision standard. *Lust*, 383 F.3d at 584. Likewise, the district court in this case seems to have taken the "rubber stamp" metaphor too literally, requiring that an explicit recommendation must cross the desk of the decisionmaker, regardless of whether the subordinate's discriminatory actions in fact caused the termination. That limitation of subordinate bias claims not only runs counter to the fairly broad "aided by the agency

relation" principle embodied in Title VII, but would leave employees unprotected so long as a subordinate stops short of mouthing the words "you should fire him," in person or on paper, to the decisionmaker. Stripped of their metaphors, subordinate bias claims simply recognize that many companies separate the decisionmaking function from the investigation and reporting functions, and that racial bias can taint any of those functions. We see no reason to limit subordinate bias liability to situations that closely resemble the "cat's paw," "rubber stamp," "conduit," "vehicle," or other metaphors that imaginative lawyers and judges have developed to describe such claims.

*BCI Coca-Cola Bottling Co.*, 450 F.3d at 488.

This court believes that, for the most part, the standard adopted by the Tenth Circuit Court of Appeals is appropriate and, moreover, is not inconsistent with the standards apparently applied, if not expressly stated, by the Eighth Circuit Court of Appeals in the decisions described above and also is not inconsistent with the agency principles that inform Title VII employer liability standards. The court will explain both its agreement and its reservations.

First, the standard adopted by the Tenth Circuit Court of Appeals, like the standard applied by the Eighth Circuit Court of Appeals, recognizes that it is not necessary for the plaintiff to show that the biased subordinate made an express recommendation that the plaintiff be terminated or otherwise subjected to detrimental job action for "cat's paw" liability to apply. *See id.* (it is not necessary for the plaintiff to show that the decisionmaker received and approved an explicit recommendation from the biased subordinate to terminate an employee); *and compare Lacks*, 147 F.3d at 725 (the allegedly biased subordinates had neither made express recommendations for detrimental job action nor had the decisionmaker deferred to their opinions or judgments). It also properly leaves

to the jury credibility determinations about the extent to which the biased subordinate caused the detrimental job action and the extent to which the purportedly independent decisionmaker properly assessed the plaintiff's situation. *See Kramer*, 157 F.3d at 624 (finding that there were jury questions of credibility on "cat's paw" liability concerning the extent to which the decisionmaker accurately assessed the plaintiff's situation or merely performed a perfunctory review). Perhaps most importantly, it requires close involvement or participation of the allegedly biased subordinate in the decisionmaking process, even if the subordinate did not "pull the trigger," *see Stacks*, 27 F.3d at 1323 ("cat's paw" liability was possible where the biased subordinate participated in every step of the decisionmaking process), clarifying that the biased subordinate's participation must be sufficient to have caused the termination. *BCI Coca-Cola Bottling Co.*, 450 F.3d at 488.

This court's reservation with the Tenth Circuit standard is with the effect of an "independent investigation" by the ultimate decisionmaker on "cat's paw" liability. Specifically, in *BCI Coca-Cola Bottling*, the Tenth Circuit Court of Appeals "reaffirm[ed] [its] earlier decisions holding that, because a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action, an employer can avoid liability by conducting an independent investigation of allegations against an employee." *Id.* (citing *English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1011 (10th Cir. 2001)); *see also id.* at 486 ("[W]e have held . . . an employer can escape liability entirely by performing an independent investigation.") (also citing *English*). That court also observed that, where the employer has conducted an independent investigation, "the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated," and that, under its precedent, "simply asking an employee for his version of events may defeat the inference that an employment decision was racially discriminatory." *Id.* at 488.

This court does not believe, however, that an "independent investigation," standing alone, should absolve an employer of "cat's paw" liability, because even if an employer conducts an "independent" investigation, and even if the decisionmaker asks the plaintiff for his or her version of events in the course of such an "independent" investigation, the ultimate adverse employment decision could still be tainted by a biased subordinate's information, participation, or recommendation. For example, where the employer has relied *to some extent* on a biased subordinate's say-so, even if the employer did not rely *exclusively* on the biased subordinate's say-so, *compare BCI Coca-Cola Bottling*, 450 F.3d at 488 (stating that the causal link is defeated, if the employer "has taken care not to rely exclusively on the say-so of the biased subordinate"), it seems to this court that at least a "mixed motives" situation is presented, and indeed, that an employer's reliance upon the biased subordinate's say-so, even if such reliance is not the sole reason for the ultimate employment decision, may be enough to establish a "because of" discrimination claim, as such a claim does not require that the illegitimate reason be the sole proximate cause of adverse employment action. *See Griffith v. City of Des Moines*, 387 F.3d 733, 740 (8th Cir. 2004) (noting that, in enacting Title VII in 1964, "Congress expressly rejected the notion that Title VII liability attached only when discrimination was the sole cause of the employment action," and that "Title VII imposed liability when discrimination motivated the employment decision"). In short, in this court's view, the focus should be *causation*, not whether the employer conducted an "independent" investigation.[5]

---

[5]Indeed, the court is not convinced that the decision in *English v. Colorado Dep't of Corrections*, 248 F.3d 1002 (10th Cir. 2001), on which the court in *BCI Coca-Cola Bottling* relied, can be read to go so far as to absolve an employer of "cat's paw" liability merely on the basis of an "independent" investigation or asking the employee for his or her version of events. In *English*, the ultimate decisionmaker "attempt[ed] to balance the
(continued...)

To put it another way, in this court's view, to break the causal link, it is the employment *determination* that must be "independent" to absolve the employer of "cat's paw" liability, where a biased subordinate is involved in the decisionmaking process, not just the *investigation* of the reasons to terminate or otherwise discipline the employee. These dual requirements, that the decisionmaker make both an independent *investigation* and an independent *determination*, are consistent with Eighth Circuit precedent, which holds that, where a truly independent decisionmaker *properly assesses the situation*, notwithstanding information or recommendations provided by the allegedly biased subordinate, the employer cannot be subjected to "cat's paw" liability, because the biased subordinate's conduct was not the cause of the adverse employment action. *See Richardson*, 448 F.3d at 1060 (the decisionmaker performed an independent review and had an independent basis for his decisions to approve the plaintiff's termination, so "cat's paw" liability did not apply); *Kramer*, 157 F.3d at 624 (the question is "whether [the decisionmaker] accurately a[ss]essed [the plaintiff's] situation or performed a perfunctory review and 'rubber stamped' the recommendation [for detrimental job action]").

---

[5](...continued)
[biased] investigators' findings with [the plaintiff's] own version of events," and it was this "balancing" that "cut[ ] off any alleged bias on the part of the investigators from the chain of events leading to [the plaintiff's] termination," so that "cat's paw" liability did not apply. *English*, 248 F.3d at 1011. Thus, it was not merely the decisionmaker's independent investigation, but his independent determination, that insulated the employer from "cat's paw" liability. For the reasons stated in the body of this decision, however, this court believes that even a "balancing" of a biased subordinate's findings or recommendations with the plaintiff's own version of events could generate a genuine issue of material fact concerning causation on either a "because of" claim or a "mixed motives" claim.

There are numerous examples that illuminate why an employer should not always be insulated from Tittle VII liability merely because the employer conducted an "independent investigation." For example, suppose that the "independent investigation" found that the employee engaged in "misconduct," but failed to note that other similarly-situated employees were not discharged for the same misconduct, and the final decisionmaker relied on the "independent investigation" as well as the "cat's paw" information that was motivated by a discriminatory intent, but weighed the "cat's paw" information more heavily than the "independent investigation" in making the termination decision. Surely, under this scenario, it would not be unreasonable for the trier of fact to find either "because of" or "mixed motives" causation. Suppose, instead, that the "independent investigation" was in equipoise on the misconduct issue and the final decisionmaker again relied more heavily on the "cat's paw" information in making the termination decision. In that situation, it would not be unreasonable for a trier of fact to find either "because of" or "mixed motives" causation. Thus, this court concludes that the better reasoned view is that if a material question of fact is generated on whether the biased "cat's paw" information influenced an adverse employment action, even where an "independent investigation" was done, it is for the trier of fact to decide whether causation existed.

### 4.    *Application of the appropriate standard*

The court finds that Coe has generated a jury question under what the court finds to be the appropriate "causation" standard. Although Doggett, the supposedly independent decisionmaker, claims to have made the decisions to discipline Coe then terminate her, NPP has conceded that Doggett attempted to make those decisions collaborative ones with Burger, the allegedly biased subordinate, and that Doggett and Burger usually consulted and agreed with each other on such employment decisions. Thus, NPP has conceded

Burger's participation in the pertinent employment decisions.  *See Stacks*, 27 F.3d at 1323 (the employer can be liable where the allegedly biased subordinate participated in every step of the adverse decisionmaking process).  It is not necessary for Coe to prove that Burger "pulled the trigger," *see id.*, or even that he made an explicit recommendation to terminate Coe.  *BCI Coca-Cola Bottling Co.*, 450 F.3d at 488; *Lacks*, 147 F.3d at 725.  Coe has also generated genuine issues of material fact that Burger did more than influence or have input into the decisionmaking process, and instead, caused the adverse employment action, *see id.* at 487-88, where she has pointed to evidence that Burger failed to disclose to Doggett that he had given Coe time off the week that she missed the mandatory meeting, where missing that meeting was purportedly the last straw and the basis for Doggett's decision to terminate Coe.  *See Kramer*, 157 F.3d at 624 (genuine issues of material fact on "cat's paw" liability were generated where, *inter alia*, the allegedly biased subordinates made material misrepresentations and omissions in presenting their recommendation to the decisionmaker to terminate the plaintiff's contract and there was evidence of their disparate treatment of female employees).  The extent to which Doggett independently assessed Coe's situation depends upon credibility assessments that properly belong to a jury.  *See Kramer*, 157 F.3d at 624.  NPP's evidence that Burger actually attempted to delay Coe's termination until she had been given an opportunity to provide an explanation for missing the mandatory meeting does not mean that there is no dispute as to whether Burger caused Coe's termination, where there is at least a genuine issue of material fact as to whether Burger had given Coe time off that week and failed to inform Doggett of that fact, even while awaiting Coe's explanation.

### G. Availability Of A "Mixed Motives" Analysis

Coe also argues that she is entitled to a "mixed motives" analysis of her "sex discrimination" claim, albeit as an "alternative" to her "cat's paw" theory. She argues that, where there is evidence of additional motives, the question of whether the presence of mixed motives "defeats" all or part of a plaintiff's claim is an issue for trial, not an issue for summary judgment. She argues, further, that even if the court were to find that NPP had some legitimate reasons for terminating her, she should nonetheless be allowed to argue the "mixed motives" analysis of her claim and that there is more than sufficient evidence that Burger's illegitimate motive played a part in the adverse employment decisions toward her, even if there were other legitimate motives. NPP responds that the mixed motives analysis applies only when a plaintiff shows by direct evidence that an illegitimate criterion was a substantial factor in the decision at issue. NPP argues that, here, Doggett made the decision to terminate Coe despite Burger's reluctance to terminate her, not because of Burger's urging. Moreover, NPP argues that Doggett could not have had any discriminatory reason to terminate Coe, as he knew nothing of alleged sexual advances by Burger at the time that he made decisions adverse to Coe. In short, NPP argues that there was nothing "mixed" about the reasons for Doggett's actions. Both parties appear to the court to have misconstrued the circumstances under which a "mixed motives" analysis is appropriate.

#### 1. "Mixed motives" and "direct evidence"

First, contrary to NPP's assertion, a "mixed motives" analysis does *not* apply only when a plaintiff shows by direct evidence that an illegitimate criterion was a substantial factor in the decision at issue. Indeed, in *Desert Palace v. Costa*, 539 U.S. 90 (2003), the Supreme Court unanimously held that, in the context of Title VII, as amended in 1991, direct evidence of discrimination *is not required* in "mixed motives" cases. *Desert Palace*,

539 U.S. at 99-101 (finding that 42 U.S.C. § 2000e-2(m) does not expressly require a heightened showing through "direct evidence" to establish a "mixed motives" claim, congressional intent was to the contrary, and the conventional rules for proof in civil cases make no distinctions between "direct" and "circumstantial" evidence, and ultimately concluding, "For the reasons stated above, we agree with the Court of Appeals that no heightened showing is required under [42 U.S.C.] § 2000e-2(m)."). Nor can *Griffith v. City of Des Moines*, 387 F.3d 733 (8th Cir. 2004), on which NPP relies, be read to support such a requirement. *See Griffith*, 387 F.3d at 736 n.2 (noting that, in *Desert Palace*, the court held that the 1991 amendments to Title VII overruled Justice O'Connor's view in *Price Waterhouse* that a plaintiff must have "direct evidence" of a discriminatory motive to get a "mixed motives" instruction). Thus, even "circumstantial evidence" of "mixed motives" will suffice to support a "mixed motives" analysis.

### 2. *"Mixed motives" and "independent decisionmakers"*

NPP is equally mistaken in its assertion that Coe cannot obtain a "mixed motives" analysis, because Doggett made an independent determination to terminate her, for legitimate reasons, so that there was nothing "mixed" about his motives for adverse action against her. In *Stacks*, as discussed above, the Eighth Circuit Court of Appeals held that a "mixed motives" analysis was appropriate where one of the participants in the decisionmaking process harbored a discriminatory animus, even if the person alleged to be the primary decisionmaker did not. 27 F.3d at 1323. Here, Coe has presented evidence that one of the people intimately involved in the adverse employment decision, Burger, was biased because of her refusal to submit to his sexual advances, even if another decisionmaker involved in the decision, Doggett, was not so tainted. Thus, this case is on all fours with *Stacks*, and a "mixed motives" analysis is available. *Id.* A "mixed motives" analysis is all the more appropriate in this case, where the supposedly independent

decisionmaker, Doggett, ratified the adverse employment decision even after learning of the improper sexual advances by the other decisionmaker, Burger, so that there is some question as to the "purity" of the supposedly independent decisionmaker's motives, as well. *Cf. id.* at 1324 (finding that, not only was there evidence of a biased subordinate's participation in every step of the decisionmaking process, but there was evidence that the supposedly independent or primary decisionmaker also harbored a discriminatory animus, so that a "mixed motives" analysis was appropriate). Therefore, a "mixed motives" analysis of Coe's *quid pro quo* harassment claim is not precluded on the ground that Doggett supposedly made independent decisions to discipline then terminate her.

### 3. *Alternative claim or defense*

Just as NPP is mistaken about the applicability of a "mixed motives" analysis, for the reasons stated above, Coe is also mistaken in her characterization of a "mixed motives" analysis as "defeating" all or part of a sex discrimination claim, *i.e.*, as a complete or partial *defense* to a sex discrimination claim. In *Griffith*, the Eighth Circuit Court of Appeals made what this court believes to be an equally mistaken assertion, albeit in *dicta*, that *either party* is entitled to a "mixed motives" jury instruction. *See Griffith*, 387 F.3d at 736 n.2. Specifically, in *Griffith*, the court stated the following in a footnote:

> *Desert Palace* held that, under the 1991 amendments, if the plaintiff presents sufficient evidence of intentional discrimination solely by reason of pretext or other circumstantial evidence, and if the defendant presents sufficient evidence that it would have taken the same adverse action in any event, *either party* is entitled to a mixed-motive jury instruction.

*Griffith*, 387 F.3d at 736 n.2 (emphasis in the original). In this court's view, this characterization of what *Desert Palace* held is, at best, only partially correct.

More specifically, with all due respect to the Circuit Court of Appeals and its opinion, footnote 2 of *Griffith* misses the mark and places the cart before the horse, because this court does not believe that a trial court judge would allow a defendant to present any evidence to support a "same decision" defense unless the plaintiff was pursuing a "mixed motives" claim under § 2000e-(2)(m) and the defendant had pleaded the "same decision" test as an affirmative statutory defense under § 2000e-5(g)(2)(B). More importantly, there is absolutely no language in *Desert Palace* that would support footnote 2 of *Griffith*, and, indeed, the footnote cites to none. The simple truth is that this stealth notion that either party may be entitled to a "mixed motives" jury instruction is simply never discussed anywhere in the *Desert Palace* decision, nor could it possibly be described as a holding in *Desert Palace*—such a notion is neither implicit, implied, or remotely suggested by the language in *Desert Palace*. Moreover, such a notion is totally inconsistent with the plain meaning of the *Desert Palace* decision, its actual holding, the plain language of the Civil Rights Act of 1991, the legislative history of that Act, and basic principles of civil procedure—*i.e.*, that "claims" belong to parties asserting them and that "defenses" belong to parties defending "claims." In this court's view, this footnote would be correct only if it meant that once a plaintiff has elected to pursue a "mixed motives" claim, and the defendant has properly pleaded the "same decision" statutory affirmative defense to such a claim, then—and only then—would the plaintiff be entitled to a "mixed motives" claim instruction and then—and only then—would the defense be entitled to a "same decision" defense instruction.

Because this court does not believe that footnote 2 of the *Griffith* decision properly characterizes what the Supreme Court said or did in *Desert Palace*, this court will explore how the Supreme Court actually did characterize a "mixed motives" analysis in *Desert Palace*. In *Desert Palace*, the Court recognized that, in *Price Waterhouse v. Hopkins*, 490

U.S. 228 (1989), the Court had concluded that an employment decision is made "because of" sex in a "mixed motives" case, where both legitimate and illegitimate reasons motivated the decision, but split over whether "direct evidence" of an illegitimate motive is required before the burden shifts to the defendant to show that it would have made the same decision without regard to the illegitimate motive. *Desert Palace*, 539 U.S. at 93-94. The Court then explained the effect of the 1991 amendments to Title VII, as follows:

> Two years after *Price Waterhouse,* Congress passed the 1991 Act "in large part [as] a response to a series of decisions of this Court interpreting the Civil Rights Acts of 1866 and 1964." *Landgraf v. USI Film Products,* 511 U.S. 244, 250, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). In particular, § 107 of the 1991 Act, which is at issue in this case, "respond[ed]" to *Price Waterhouse* by "setting forth standards applicable in 'mixed motive' cases" in two new statutory provisions. 511 U.S., at 251, 114 S. Ct. 1483. The first establishes *an alternative* for proving that an "unlawful employment practice" has occurred:
>
> > "*Except as otherwise provided in this subchapter*, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).
>
> The second provides that, with respect to "a claim in which an individual proves a violation under section 2000e-2(m)," the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff. The available remedies include only declaratory relief, certain types of injunctive relief, and attorney's fees and costs. § 2000e-5(g)(2)(B). In order to avail itself of the affirmative defense, the employer must "demonstrat[e] that [it] would have taken the same action in the absence of the impermissible motivating factor." *Ibid.*

*Desert Palace*, 539 U.S. at 94-95 (footnotes omitted; emphasis added).  Thus, *Desert Palace* makes clear that a § 2000e-2(m) "mixed motives" *claim* is *an alternative claim* to a "because of" claim under § 2000e-2(a)(1), not a defense that "defeats" all or part of a "because of" claim.  The statutory language itself plainly supports the conclusion that a "mixed motives" claim is an *alternative* to a "because of" claim, because § 2000e-2(m) states that, "[e]xcept as otherwise provided in this subchapter," *i.e.*, except as provided for a "because of" claim under § 2000e-2(a), an unlawful employment practice is established by proof of "mixed motives."  42 U.S.C. § 2000e-2(m).  Moreover, it follows that, because a "mixed motives" claim is an independent, alternative *claim* to a "because of" claim, the plaintiff has a choice of whether or not to pursue one or both claims.  In other words, the choice of whether or not to invoke a "mixed motives" alternative *belongs to the plaintiff*.

It should not be assumed that a plaintiff would always or even often choose to pursue a "mixed motives" claim under § 2000e-2(m), either as a stand-alone claim or as an alternative to a "but for" claim under § 2000e-2(a).  While it might appear, at least at first blush, that "mixed motives" claims would almost always be favored by plaintiffs, because of the lesser causation burden, my experience as a trial court judge is to the contrary, both after passage of the 1991 Act and after *Desert Palace*.  The reason that "mixed motives" claims are not as prevalent as one might assume is that, in several respects, a "mixed motive" claim has the very real potential to be a Trojan Horse for the plaintiff.  While it is easier to prove "mixed motive" causation than to prove "but for" causation, the lower burden comes at a price:  The defendant is allowed to offer the "same decision" affirmative defense.  Thus, although the trier of fact may well find liability on a "mixed motives" claim, the plaintiff may ultimately recover nothing if the trier of fact also finds for the defense on the "same decision" defense.  When faced with the real

possibility of passing through the gauntlet of an employment discrimination trial, this court doubts that many plaintiffs would be willing to run the risk of prevailing on liability, but still receiving no monetary compensation for their efforts. This court also doubts that many plaintiffs would be happy to find that insult is added to injury, when they will receive nothing, but their lawyers will be compensated by the employer. *See* 42 U.S.C. § 2000e-5(g)(2) (if the plaintiff proves a "mixed motives" claim, but the employer proves a "same decision" defense, the remedies are limited to declaratory and injunctive relief and attorney fees and costs); *see also Richardson*, 448 F.3d at 1057 ("The employer's affirmative defense 'does not absolve it of liability, but restricts the remedies available to a plaintiff.'" (quoting *Desert Palace*, 539 U.S. at 94, and citing § 2000e-5(g)(2)(B)). Indeed, this court has often wondered if plaintiffs' lawyers explain these realities to plaintiffs and let them decide whether to pursue a "but for" or "mixed motive" claim or both. If an attorney does not make such a full disclosure that allows the plaintiff personally to decide which claim or claims to pursue, this court suggests that there may be a conflict of interest between the lawyer and the client. After all, there are some cases in which it is to the plaintiff's lawyer's advantage to pursue a "mixed motives" claim, which would provide compensation to the lawyer, but it would not be to the plaintiff's advantage to do so, because the plaintiff might recover nothing, and vice versa.

The final point to be made about "mixed motives" claims is that, if the plaintiff pursues a "mixed motives" claim, then the defendant may elect to assert the limited "same decision" affirmative defense under § 2000e-5(g)(2)(B). Section 2000e-5(g)(2)(B) provides for the "same decision" defense as follows:

> *On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor*, the court—

> (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title; and
>
> (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e-5(g)(2)(B) (emphasis added). Thus, contrary to the footnote in *Griffith*, which suggests that either party may request a "mixed motives" instruction, the italicized language of the statute makes clear that the "same decision" can be raised as a *defense* only *after* the plaintiff proves a "mixed motives" claim under § 2000e-2(m).

### 4. Coe's "mixed motives" claim

Here, Coe's Complaint never explicitly asserts a "mixed motives" alternative to her "sex discrimination" claim in **Count 1**, but neither does it exclude the possibility. *See* Complaint (docket no. 1), **Count 1** (pleading "sex discrimination" in violation of Title VII). In her briefing of NPP's summary judgment motion, however, Coe has explicitly asserted that she is entitled to a "mixed motives" analysis, *i.e.*, to assert a "mixed motives" alternative claim under § 2000e-2(m) as well as her "because of" claim under § 2000e-2(a)(1). *See Desert Palace*, 539 U.S. at 94-95 (explaining that "mixed motives" is an alternative *claim* to a "because of" claim under Title VII). Again, the court concluded, above, that Coe has generated genuine issues of material fact on such an alternative "mixed motives" claim, by pointing to evidence that a biased subordinate, Burger, participated in every stage of the decisionmaking process, and that the allegedly independent decisionmaker, Doggett, ratified Burger's conduct by standing by the decision to fire Coe even after learning of Burger's alleged harassment, so that even Doggett's motives might have been "mixed." *See Stacks*, 27 F.3d at 1323-24 (where one of the

participants in the decision was biased, the plaintiff is entitled to assert a "mixed motives" claim, even if the other decisionmaker was purportedly unbiased). Although NPP has asserted that Doggett made an independent decision untainted by any "mixed" motives, it has not explicitly asserted a "same decision" affirmative defense thus far. *See Desert Palace*, 539 U.S. at 94-95 (explaining that, under the 1991 amendments to Title VII, if the plaintiff proves a "mixed motives" claim under § 2000e-2(m), the defendant can assert a "same decision" affirmative defense under § 2000e-5(g)(2)(B)). In any event, because there are genuine issues of material fact on Coe's alternative "mixed motives" claim, NPP is not entitled to summary judgment on that alternative claim, either.

## H. Vicarious Liability

NPP's final challenge to Coe's *quid pro quo* claim is that NPP cannot be held either vicariously or directly liable for the alleged harassment, because the alleged harasser was not a managerial employee, NPP had no knowledge of the supposed harassment, and any harassment was directly contrary to clear company policies well known to all involved. The court finds that this challenge can be dealt with comparatively briefly.

### 1. Vicarious liability and the Ellerth/Faragher affirmative defense

If the plaintiff establishes harassment by a "supervisor," then the employer is vicariously liable, unless the employer demonstrates that it is entitled to the *Ellerth/Faragher* affirmative defense. *Jenkins v. Winter*, 540 F.3d 742, 748-49 (8th Cir. 2008) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998))). That affirmative defense provides that, if the employer exercised reasonable care to avoid harassment and to eliminate it when it might occur, and the complaining employee failed to act with like reasonable care to take advantage of the employer's safeguards or otherwise to prevent harm that could be

avoided, then the employer is not liable. *Adams v. O'Reilly Automotive, Inc.*, 538 F.3d 926, 930 (8th Cir. 2008). That affirmative defense is unavailable, however, if the employee suffers a tangible employment action as the result of the harassment. *Jenkins*, 540 F.3d at 749. As the Eighth Circuit Court of Appeals has explained, "'A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1144 (8th Cir. 2007), with internal quotation marks omitted).

### 2.     Harassment by a "supervisor"

NPP's first contention in support of its challenge to employer liability is that Burger, the alleged harasser, was not a "supervisor." As the Eighth Circuit Court of Appeals recently explained,

> "[T]o be considered a supervisor, 'the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties.'" *Weyers v. Lear Operations Corp.,* 359 F.3d 1049, 1057 (8th Cir. 2004) (quoting *Joens [v. John Morrell & Co.],* 354 F.3d [938,] 940 [(8th Cir. 2004)]). The fact that an alleged harasser may have been a "team leader" with the authority "to assign employees to particular tasks" will not be enough to make that person a supervisor. *Id.* (holding that the fact that the alleged harasser may have been a team leader who was responsible for ensuring that an assembly line ran according to schedule and assigned tasks on the line—which had an impact on the employees' training—was not enough to make that person a supervisor).

*Merritt v. Albemarle Corp.*, 496 F.3d 880, 883-84 (8th Cir. 2007). Applying this standard, the court in *Merritt* found that the alleged harasser was not a "supervisor,"

because he had no authority to effect a change in the plaintiff's employment status or to make economic decisions affecting other employees, where his authority was restricted to assigning the plaintiff to work on various tasks that were part of her work duties. *Id.* at 884. Thus, the court concluded that the alleged harasser's authority was no greater than that of a "team leader" and was not sufficient to make him a "supervisor." *Id.* Similarly, the Eighth Circuit Court of Appeals has rejected the notions that merely consulting with one with authority to take tangible employment action or appearing to the victim of harassment to have "supervisory" authority makes a person a "supervisor" within the meaning of the *Ellerth/Faragher* defense. *See Chesewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 851 (8th Cir. 2005).

On the other hand, this court has noted that this circuit's definition of "supervisor," stated above, does *not* give an exclusive list of the types of significant job events that an individual must have authority over in order to be a "supervisor"—rather, the definition merely gives a non-exhaustive sampling of the types of activities that would qualify as tangible employment actions within a "supervisor's" authority. *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 991 (N.D. Iowa 2004). Indeed, the Eighth Circuit Court of Appeals has added "disciplining employees" to the list of tangible employment actions within a "supervisor's" authority. *See Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004) (albeit finding that the alleged supervisor in that case was not a "supervisor," because he lacked the authority to discipline employees in his department); *Joens v. John Morrell & Co.*, 354 F.3d 938, 941 (8th Cir. 2004) (also recognizing "disciplining employees" as within a "supervisor's" authority).

Here, although NPP asserts that only Doggett had ultimate authority to hire or fire employees, NPP concedes that Doggett usually exercised that authority not merely in "consultation" with Burger, but that he made hiring and firing decisions "in collaboration"

with Burger. *Compare Chesewalla*, 415 F.3d at 851 (merely "consulting" in employment decisions is not enough to make one a "supervisor"). Moreover, NPP concedes that Burger's job was to discipline employees, even though Doggett asserts that he believed that Burger found that difficult to do and needed to be pushed to do it. *See Weyers*, 359 F.3d at 1057 (power to discipline employees makes one a "supervisor"); *Joens*, 354 F.3d at 941 (same). The record evidence to which Coe points concerning Burger's involvement in evaluating her performance and disciplining her for misconduct or performance problems and in the ultimate decision to terminate her is sufficient, at the very least, to generate genuine issues of material fact as to whether or not Burger was a "supervisor" capable of taking tangible employment actions against her and whether he did, in fact, do so for discriminatory reasons, such that there are genuine issues of material fact as to whether NPP can be held vicariously liable for alleged *quid pro quo* harassment by Burger.

### 3.     *NPP's other contentions*

Because there are genuine issues of material fact as to vicarious liability, including whether Burger took tangible employment action against Coe, and, hence, the availability of the *Ellerth/Faragher* affirmative defense, the court finds it unnecessary to reach NPP's further contentions that it cannot be held liable for "co-worker" harassment, because it did not know about the alleged harassment, and that, even if Burger was a supervisor, NPP will be able to prove its *Ellerth/Faragher* affirmative defense in the absence of harassment resulting in a tangible employment action, because it had in place adequate policies concerning sexual harassment, and Coe never complained about the alleged harassment until after she was terminated. Thus, NPP is not entitled to summary judgment on Coe's *quid pro quo* claim on the ground that there is no basis for vicarious employer liability.

70

### *I. Coe's Retaliation Claim*

Coe's "retaliation" claim in **Count II** of her Complaint is the "poor relation" in the party's briefing of NPP's motion for summary judgment. Nevertheless, that claim also deserves some attention.

### *1.      Arguments of the parties*

NPP argues that it is entitled to summary judgment on Coe's retaliation claim for much the same reason that it is entitled to summary judgment on Coe's *quid pro quo* claim: There is no link between the decision to terminate her and any alleged misconduct by Burger. Somewhat more specifically, NPP argues that Coe cannot identify any timely opposition to any misconduct or any resulting adverse employment action, where she never complained to Burger or anyone else about his conduct before she was terminated, and her termination was by Doggett for performance issues, and Doggett knew nothing about any alleged misconduct by Burger at the time that he terminated Coe. In essence, NPP argues that it could not retaliate for something it knew nothing about.

In response, Coe argues that she opposed workplace discrimination by refusing to accede to Burger's demands for sexual favors or what she reasonably perceived to be demands for sexual favors. After she opposed such conduct, she contends that Burger became hostile towards her, disciplined her more severely than others, and ultimately terminated her without legitimate reasons, where he had given her time off because her truck was in for repairs at the time that she missed a mandatory meeting she knew nothing about. At the oral arguments on NPP's summary judgment motion, Coe argued that Burger effectively retaliated against her for refusing his sexual advances and that, while some courts have ruled that refusal of sexual advances is not "opposition" to sexual harassment for purposes of a retaliation claim, those cases involved co-worker harassment, but the result should be different where the harasser is the plaintiff's manager, because the

manager's retaliation for refusal of sexual advances is the company's retaliation for opposing sexual harassment. Coe also distinguished her *quid pro quo* claim from her retaliation claim on the basis that, even if the *quid pro quo* claim failed, her retaliation claim could survive, because she reasonably believed that she was subjected to prohibited *quid pro quo* harassment.[6]

NPP does not even mention Coe's retaliation claim in its reply brief and did not add to its argument concerning this claim at oral arguments.

### 2. *Elements of a* **prima facie** *case*

The Eighth Circuit Court of Appeals recently summarized the basis for a retaliation claim under Title VII and the elements of a *prima facie* case of retaliation, as follows:

> Federal law prohibits an employer from discriminating against an employee who "has opposed any practice" made unlawful by Title VII, or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under the statute. 42 U.S.C. § 2000e-3(a); *see Barker v. Missouri Dept. of Corrections,* 513 F.3d 831, 834 (8th Cir. 2008). To establish even a *prima facie* case of retaliation, [the plaintiff] must demonstrate that (1) she engaged in statutorily protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct. *Weger v. City of Ladue,* 500 F.3d 710, 726 (8th Cir. 2007). An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation. *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 715 (8th Cir. 2000). A materially adverse action is one

---

[6]Coe also suggested that she might, nevertheless, withdraw her retaliation claim, if her *quid pro quo* claim survives summary judgment, because the retaliation claim is pleaded essentially as a "fall back" claim.

that would have "dissuaded a reasonable worker from making
or supporting a claim of discrimination." *Burlington N. &
Santa Fe R. Co. v. White,* 548 U.S. 53, 126 S. Ct. 2405,
2415, 165 L. Ed. 2d 345 (2006) (internal quotation omitted).

*Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008). The court turns to whether Coe can generate genuine issues of material fact on the required elements of her retaliation claim.

### 3.    Coe's **prima facie** *case*

Coe argues that the "protected activity" establishing the first element of her retaliation claim, *see id.*, is, in fact, the same as the conduct on which her *quid pro quo* claim is based, her refusal to submit to Burger's sexual advances. District courts confronting the question have split on whether resisting sexual advances constitutes protected activity for purposes of Title VII, and, to date, it does not appear that any Circuit Court of Appeals has decided the question. *See Berg v. Aetna Freight Lines*, 2008 WL 3895935, *3 (W.D. Pa. Aug. 19, 2008) (slip op.) (so noting); *see also Murray v. Chicago Transit Auth.*, 252 F.3d 880, 890 (7th Cir. 2001) (declining to decide whether the rejection of sexual advances constitutes a statutorily protected activity within the meaning of Title VII). Although the Eighth Circuit Court of Appeals considered a retaliation claim based, in part, on the plaintiff's allegations that she suffered negative job performance reviews because she refused her supervisor's advances, the court rejected the plaintiff's *prima facie* case on the ground that the allegedly retaliatory actions were not sufficiently adverse to constitute actionable employment action, without addressing whether refusal of sexual advances could constitute protected activity. *See Henthorn*, 359 F.3d at 1028-29.

One district court to examine the split on the question has concluded that refusing sexual advances is protected, because a "victim of harassment should not fear retaliation if she resists sexually predatory behavior by colleagues and supervisors." *Roberts v.*

*County of Cook*, 2004 WL 1088230, *5 (N.D. Ill. May 12, 2004) (slip op.).[7] That court

[7]The court in *Roberts* noted the following:

> Several judges of this Court have stated that the refusal of sexual advances does not constitute protected activity, *see Jones v. County of Cook,* No. 01 C 9876, 2002 WL 1611606, at *4 (N.D.Ill. July 17, 2002); *Bowers v. Radiological Society of North America, Inc.,* 57 F. Supp. 2d 594, 599 (N.D.Ill.1999); *Speer v. Rand McNally & Co.,* No. 95 C 6269, 1996 WL 667810, at *8 n. 4 (N.D.Ill. Nov.15, 1996), *Finley v. Rodman & Renshaw, Inc.,* No. 93 C 5504, 1993 WL 512608, at *3 (N.D.Ill.1993), as has one judge in the District of Maryland, *Rachel-Smith v. FTData, Inc.,* 247 F. Supp. 2d 734, 748-49 (D.Md.2003), and three in New York. *See Fitzgerald v. Henderson,* 36 F. Supp. 2d 490, 499 (N.D.N.Y.1998), *aff'd in part, rev'd in part on other grounds,* 251 F.3d 345 (2d Cir. 2001); *Rashid v. Beth Israel Medical Center,* No. 96 Civ. 1833, 1998 WL 689931, at *2 (S.D.N.Y. Oct.2, 1998); *Del Castillo v. Pathmark Stores, Inc.,* 941 F. Supp. 437, 438-39 (S.D.N.Y.1996). But there is an equal number of district court judges who have found the refusal of sexual advances to constitute protected activity. *See Little,* 210 F. Supp. 2d at 385-86; *Black v. City & County of Honolulu,* 112 F. Supp. 2d 1041, 1049 (D.Haw.2000); *Farrell v. Planters Lifesavers Co.,* 22 F. Supp. 2d 372, 392 (D.N.J.1998), *aff'd in part, rev'd in part on other grounds,* 206 F.3d 271 (3d Cir. 2000); *Fleming v. South Carolina Department of Corrections,* 952 F. Supp. 283, 288 (D.S.C.1996); *Armbruster v. Epstein,* No. Civ. A 96-CV-1059, 1996 WL 289991, at *3 (E.D.Pa. May 31, 1996); *EEOC v. Domino's Pizza,* 909 F. Supp. 1529, 1536 (M.D.Fla.1995); *Burrell v. City University of New York,* 894 F. Supp. 750, 761 (S.D.N.Y.1995); and *Boyd v. James S. Hayes Living Health Care Agency, Inc.,* 671 F. Supp. 1155, 1167 (W.D.Tenn.1987).

(continued…)

reasoned as follows:

> Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because *he has opposed any practice made an unlawful employment practice by this subchapter,* or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). Sexual harassment is clearly an unlawful employment practice under Title VII: the Supreme Court has read 42 U.S.C. § 2000e-2(a)(1) as prohibiting "sexual harassment so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher,* 524 U.S. at 786 (internal quotation marks and citation omitted). Opposing sexually harassing behavior constitutes "oppos[ing] any practice made an unlawful employment practice" by Title VII, and accordingly it is activity protected by § 2000e-3(a). This comports with the purpose of Title VII's anti-retaliation provision.

*Roberts*, 2004 WL 1088230 at *5 (emphasis in the original).

This court notes that several other district courts have found this reasoning persuasive. *See, e.g., Berg*, 2008 WL 3895935 at *3 (citing three district courts within the Third Circuit that have adopted the reasoning in *Roberts* and joining them); *Tate v. Executive Mgmt. Servs., Inc.*, 2006 WL 1408406, *5 (N.D. Ind. May 12, 2006) (slip op.) (denying a motion for summary judgment on a retaliation claim based on alleged retaliation for terminating an affair with a supervisor on the reasoning of *Roberts*); *McCulley v. Allstates Tech. Servs.*, 2005 WL 1475314, *21 (S.D. Ala. June 21, 2005) (slip op.) (agreeing with *Roberts* that "a supervisor's sexually harassing conduct is clearly a practice

---

[7](...continued)
*Roberts*, 2004 WL 1088230 at *4.

rendered unlawful by Title VII, and an employee's rejection of such activities is plainly a means of opposing such unlawful conduct"); *see also Little v. National Broadcasting Co.*, 210 F. Supp. 2d 330, 386 (S.D.N.Y.2002) (pre-*Roberts* case finding that rejecting a supervisor's sexual advances constitutes protected activity under Title VII); *Farrell v. Planters Lifesavers Co.*, 22 F. Supp. 2d 372, 392 (D.N.J. 1998) (pre-*Roberts* case holding that "rejection of sexual advances is a protected activity within the meaning [of] Title VII").

This court agrees with these decisions only to the extent that the court finds that it is *theoretically* possible for refusal of a superior's sexual advances to constitute "protected activity" for purposes of a § 2000e-3(a) "retaliation" claim. This court perceives certain *factual* limitations on or requirements for proof of such a claim, however.

First, to establish the "protected activity" element of a retaliation claim, the plaintiff must show (and ultimately prove) that the sexual advances that she rejected amounted to conduct that a reasonable person could have believed violated Title VII's standards. *See, e.g., Barker v. Missouri Dep't of Corrections*, 513 F.3d 831, 835 (8th Cir. 2008) ("Conduct is not actionable under Title VII if no reasonable person could have believed the incident violated Title VII's standard."); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (a plaintiff cannot base a Title VII retaliation claim on opposition to conduct that no reasonable person could have believed violated Title VII's standard for actionable discrimination or harassment). Here, Coe does not allege that any job benefit or job detriment was expressly or even impliedly made contingent upon her acceptance or rejection of the alleged sexual advances by Burger, only that job detriments later followed from her failure to respond favorably to Burger's advances. *See Ogden*, 214 F.3d at 1006 n.8 (a *quid pro quo* claim may be based on either a claim that the plaintiff's "submission to the unwelcome advances was an express or implied condition for receiving

a job benefit or her refusal to submit resulted in a tangible job detriment").[8]  Thus, at the time of the alleged sexual advances, and her refusal of them, Coe could not have reasonably believed that she was being subjected to *quid pro quo* harassment.  Therefore, for her retaliation claim to survive, Coe must show that she could have reasonably believed, at the time of the alleged sexual advances and her refusal of them, that those advances amounted to hostile environment sexual harassment.  *Breeden*, 532 U.S. at 271 (to support a retaliation claim, the plaintiff must show that a reasonable person could have believed that the conduct she opposed violated Title VII).  Although hostile environment harassment requires "severe or pervasive" conduct, a single incident may be sufficiently "severe" to support such a claim or for a person to reasonably believe that she had been subjected to such harassment.  *See, e.g., McCurdy v. Arkansas State Police*, 375 F.3d 762, 768 & n.6 (8th Cir. 2004) (noting that, where a harassment claim is based on a single incident, that incident must be sufficiently severe to be actionable).  The court will assume, without deciding, that Coe has alleged conduct by Burger, in the form of one or more invitations to enjoy his "company" and to come to his motel room, that is sufficiently severe or pervasive that a reasonable person could have believed that it constituted illegal hostile environment sexual harassment.

---

[8]To be clear about timing, Coe has not alleged that any sexual advances occurred after the first two weeks of October 2006 and she has not alleged that any job detriments occurred until later in October, November, and December.  Thus, on this record, a reasonable juror could find only that the job detriments allegedly imposed by Burger were intended to punish Coe for not submitting to Burger's alleged sexual advances, but could not find that any job detriments were imposed in an attempt to induce Coe to submit to Burger's alleged sexual advances.  Moreover, Coe's allegedly protected activity, refusing Burger's advances, occurred before any job detriments were imposed, *i.e.*, before any *quid pro quo* claim was complete and actionable.

Second, and more importantly here, in this court's view, to prove "opposition" within the "opposition clause" of § 2000e-3(a), the plaintiff must prove some affirmative complaint or report about the conduct in question that attributed the impropriety of the conduct to harassment, discrimination, or other conduct that would violate Title VII. *See, e.g., Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) (although the plaintiff complained that she was entitled to a pay increase and a change in job title, "she did not attribute NPPD's failure to give her a raise or a promotion to sex discrimination," so she "was not engaged in a protected activity for purposes of Title VII"); *Genosky v. Minnesota*, 244 F.3d 989, 993 (8th Cir. 2001) (although the plaintiff complained about "unfair" treatment, she did not complain about "unlawful discriminatory treatment" and, thus, could not establish that she opposed an unlawful employment practice). It is not enough to show that the plaintiff simply deflected invitations or advances that the recipient considered improper or offensive, which is all that Coe did in this case. This requirement of a complaint attributing the impropriety of the conduct to a violation of Title VII follows from the language of § 2000e-3(a) itself, which affords protection from retaliation to one who "has opposed any practice made an unlawful employment practice by" Title VII. *See* 42 U.S.C. § 2000e-3(a). Although Coe did not accept Burger's invitations for "company" or to come to his motel room, the parties agree that at no time prior to her termination did Coe complain to anyone at NPP or even tell anyone at NPP about Burger's alleged advances, let alone tell anyone at NPP that she believed Burger's conduct constituted harassment, nor did she tell Burger that his conduct made her uncomfortable.

Nor can Coe base a retaliation claim on her later report to Doggett of Burger's sexual advances and Doggett's refusal to set aside his decision to terminate her. To raise a genuine issue of material fact on the necessary causal connection between the protected

conduct and the materially adverse action, the third element of a *prima facie* case of retaliation, the plaintiff must "show that the employer had actual or constructive knowledge of the protected activity," *Hervey*, 527 F.3d at 722 (citing *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 715 (8th Cir. 2000)), and "'more than a temporal connection . . . is required.'" *Id.* at 723 (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)). As the Eighth Circuit Court of Appeals explained in *Hervey*,

> The wisdom of this rule is evident in a case such as this, where the employee was accused of insubordination *before* she notified the employer of her protected activity. Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action. "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002). *See also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

*Hervey*, 527 F.3d at 723. Thus, in *Hervey*, the court concluded that the plaintiff could not "create a submissible case of unlawful retaliation by interjecting her announcement of a discrimination claim in the middle of a previously scheduled meeting to discuss her [performance problems]." *Id.* Here, the parties agree that Coe also did not make any complaint about Burger's conduct—*i.e.*, that she believed she was being terminated in retaliation for refusing his advances—until the middle of the call in which Doggett explained the reasons for her termination, and that she did so only after it was clear that she was being terminated. Thus, the circumstances here are analogous to those in *Hervey*,

and as such, bar Coe's retaliation claim. *See id.* To the extent that Burger allegedly engineered Coe's termination "in retaliation" for Coe's refusal of Burger's sexual advances, and Doggett was merely his "cat's paw," that claim and any relief that might flow from it is fully encompassed by Coe's *quid pro quo* claim.

Therefore, NPP is entitled to summary judgment on Coe's retaliation claim in **Count II**.


### J. Punitive Damages

Finally, NPP contends that, even if Coe has submissible claims, NPP is entitled to summary judgment on Coe's prayer for punitive damages on any of those claims. Coe argues, however, that there is sufficient evidence to warrant submission of the question of punitive damages to a jury.

#### 1. Arguments of the parties

NPP reiterates its argument that Burger was not a managerial employee, then argues, further, that NPP never authorized or ratified his conduct nor was NPP reckless in hiring him, so that NPP should not be liable for punitive damages. In the alternative, even if Burger was a managerial employee, NPP argues that it is not liable for punitive damages, because Burger's conduct was plainly contrary to good faith, highly successful efforts by NPP to comply with Title VII. NPP points out that it had in place an anti-discrimination policy—indeed, a "zero tolerance" sexual harassment policy—which it had enforced, so that there had been only three sexual harassment complaints in thirty years. NPP points out, as well, that Coe did not complain about alleged harassment while she was employed by NPP, but Doggett nevertheless investigated her complaint, and properly found no merit to it. Consequently, NPP argues that there is no evidence of malice or reckless indifference.

Coe argues that Burger had only a limited understanding of what constitutes sexual harassment, because NPP did not provide any sexual harassment training until after her lawsuit was filed, and then only because of it. Coe also argues that various factors point to NPP's lack of good faith in implementing its anti-discrimination policy: NPP made no real effort to educate employees or managers about sexual harassment until after Coe's lawsuit was filed; when Doggett learned of Coe's harassment complaint, he did not investigate it beyond telling Burger to write down his version of events, ignored Coe's complaint because she had already been terminated, and attempted to downplay the significance of the conduct by submitting incomplete summaries of events that did not include Burger's invitation to Coe to come to his motel room and minimizing Burger's role in Coe's termination. Coe also asserts that, contrary to NPP's contentions, Burger was a "manager."

### 2. *Applicable standards*

As the Eighth Circuit Court of Appeals recently explained,

> Punitive damages may be awarded for an intentional Title VII violation if the employer acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C, § 1981a(b)(1). The requisite showing of malice or reckless indifference requires proof that the employer "at least discriminate[d] in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 536, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999). Thus, punitive damages are inappropriate if the employer was unaware of the federal prohibition, or if the plaintiff's underlying theory of discrimination was novel or poorly recognized, or if the employer reasonably believed that its discrimination satisfied a bona fide occupational defense. *Id.* at 537, 119 S. Ct. 2118. Moreover, even if particular agents exhibited malice or reckless indifference, the employer may avoid vicarious

> punitive damages liability by showing that it made good faith efforts to comply with Title VII. *Id.* at 545-46, 119 S. Ct. 2118. Given these stringent standards, plaintiffs face a "formidable burden" when seeking punitive damages for employment discrimination. *Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.,* 439 F.3d 894, 903 (8th Cir. 2006) (quotation omitted).

*Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1035 (8th Cir. 2008); *accord Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 889 (8th Cir. 2008) (retaliation case stating the same standards and reiterating, "'Malice or reckless indifference exhibited by employees working in a managerial capacity can be imputed to the employer if they were acting in the scope of their employment,'" and that "[a]n employer cannot be vicariously liable . . . for discriminatory employment decisions of managerial agents where those decisions are contrary to the employer's good-faith efforts to comply with Title VII," quoting *Dominic v. DeVilbiss Air Power Co.*, 493 F.3d 968, 976 (8th Cir. 2007), with citations and internal quotation marks omitted).

### 3. NPP's "good faith"

The court finds that there are at least genuine issues of material fact as to whether Burger was a managerial employee and whether he acted with malice or reckless difference to Coe's federally protected right to be free from *quid pro quo* harassment, where, for example, both Burger and Doggett admitted that they recognized that Burger's invitations to Coe would violate NPP's sexual harassment policy. *Id.* There may even be inferences that Burger and Doggett acted with malice and reckless indifference to Coe's rights, where Coe has produced evidence that Doggett and Burger failed to include Burger's invitations to Coe to come to his motel room in information and statements provided to the Iowa Civil Rights Commission. Thus, the question here is whether Coe can generate genuine issues of material fact that NPP did *not* make good-faith efforts to comply with Title VII. *Id.*

The court finds that Coe cannot meet the "formidable burden" imposed upon her. *Id.* As NPP points out, and Coe does not dispute, NPP had in place a "zero tolerance" sexual harassment policy and all employees received copies of or were aware of the existence of the policy. While Coe attempts to make much of the lack of specific anti-harassment or anti-discrimination training until after her termination and because of her complaints, that assertion fails to generate a genuine issue of material fact of lack of good faith on punitive damages here, where Coe does not effectively dispute that, prior to Coe's complaint, NPP had a thirty-year track record of remarkably few incidents of alleged harassment that might have triggered a responsibility for more aggressive anti-discrimination or anti-harassment training.[9] Therefore, the court concludes that punitive damages should not be submitted to the jury in this case and NPP's motion for summary judgment on Coe's prayer for punitive damages will be granted.

### III. CONCLUSION

While NPP's motion for summary judgment in this case presents numerous issues, the court's key conclusions are the following. First, Coe has generated genuine issues of material fact on her *quid pro quo* sexual harassment claim based, in part, on "cat's paw" liability, and she may pursue both "because of" and "mixed motives" alternatives for that claim. Second, Coe has not generated genuine issues of material fact on her retaliation

---

[9] Coe's attempts to dispute the existence of NPP's sexual harassment policy, employees' knowledge of the existence of such a policy, and the existence of only two prior incidents of alleged sexual harassment in the thirty years prior to Coe's complaint are based entirely on her contention that the testimony on which these factual assertions are based comes from "interested" or "impeached" witnesses. For the reasons set out in Section II.A.2, beginning on page 20, Coe's response to these factual assertions fails to generate genuine issues of material fact.

claim, because she cannot establish the "protected activity" element of that claim, even if refusal of sexual advances by a supervisor could theoretically support such a claim, where she did not complain to anyone at NPP or to her alleged harasser that conduct to which she was subjected constituted harassment, discrimination, or other conduct that would violate Title VII. Third, Coe has not generated genuine issues of material fact on her prayer for punitive damages on her Title VII claims, where she has not generated genuine issues of material fact on the lack of good-faith efforts by NPP to prevent harassment.

THEREFORE, NPP's September 19, 2008, Motion For Summary Judgment (docket no. 15) is **granted in part and denied in part**. Specifically,

1.    That part of NPP's Motion For Summary Judgment seeking summary judgment on Coe's "sex discrimination" claim in **Count I** is **denied**;

2.    That part of NPP's Motion For Summary Judgment seeking summary judgment on Coe's "retaliation" claim in **Count II** is **granted**; and

3.    That part of NPP's Motion For Summary Judgment seeking summary judgment on Coe's prayer for punitive damages is **granted**.

**IT IS SO ORDERED.**

**DATED** this 2nd day of December, 2008.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA